## UNITED STATES *v*. JUSTICE.

Where a contractor with the United States and the United States disagree as to what is justly due to the contractor, and the question is referred to a commission constituted by proper authority to audit such claims as that of the contractor's, and the commission finds a certain sum as justly due, and the contractor receives that sum, he cannot sustain a claim in the Court of Claims for a further sum, even though he have given no receipt in full.

APPEAL from the Court of Claims; the case, as found by it, being thus:

On the 12th of August, 1861, Philip S. Justice, by a letter to Lieutenant Treadwell, first lieutenant of ordnance, proposed to supply the Ordnance Department with 4000 rifled

muskets, " *similar in style and finish to the sample deposited* " with the said lieutenant, at $20 each.

On the next day Lieutenant Treadwell, inclosing Justice's proposition, wrote to General Ripley, then chief of ordnance, at Washington, as follows:

"I inclose a proposition from Mr. Justice to furnish rifle muskets, calibre .69. I have examined a sample of the musket, and *it is a good serviceable arm*, .69 calibre, clasp bayonet, long-range sight, original percussion barrel, and well finished."

On August 16th, 1861, General Ripley replied to Lieutenant Treadwell, saying:

"You are authorized to accept Mr. Justice's proposition."

And on August 17th, 1861, Lieutenant Treadwell wrote to Justice as follows:

"I am authorized by the Ordnance Department to accept your proposal of August 12th, to furnish for the United States 4000 rifled muskets, calibre $\frac{69}{100}$ of an inch, *equal in all respects to the sample deposited with me*, at $20."

In execution of the contract, Justice delivered from time to time, 2174 rifled muskets, all of which were inspected by subordinate officers appointed by Lieutenant Treadwell, and received under his official certificate that they had been duly inspected and approved. "These arms" thus furnished, "were not," as the Court of Claims found, "in all respects, similar to the sample arm, but on an average not inferior to it; which was far from being a standard or first-class arm of the United States. It was not equal to the Springfield rifle. And the Justice arms were far from being a first-class arm."

Before the 19th of March, 1862, *all* the muskets, with the exception of 472, had been received and approved; and had also been paid for by the United States at the contract price of $20 each. These 472 were delivered on the said 19th of March; on which day Lieutenant Treadwell acknowledged their receipt, and issued to Justice a final voucher showing that there was due to him for these and some other arms, the sum of $19,171.25.

The muskets thus furnished by Justice were given to three regiments of Pennsylvania volunteers in the field, who were accordingly armed with them. Some time afterwards the Ordnance Department receiving serious complaints from these regiments, alleging that the arms were unserviceable, ordered reinspections of the arms in the hands of these troops, as well as of those remaining yet in store. The reinspection of the arms in the hands of each of these regiments was made by Lieutenant Harris, of the Ordnance, Colonel Doubleday, of the Artillery, and Assistant Inspector-General Buford. It showed that many of the guns were made up of parts of condemned muskets; that the stocks were of soft, unseasoned wood, and were defective in construction; that most of the barrels abounded in flaws; that many locks were defective, that the sights had been merely soldered on, and came off with the gentlest handling; that the bayonets bent "like lead," and came off, and that so many of the guns burst that the men were afraid to use them; and that as a whole, the arms in the hands of the troops were "a worthless lot of arms, unfit for service and dangerous to those who used them."

Of the arms yet in store, the inspection was made by Lieutenant Treadwell in person. He reported to General Ripley, March 28th, 1862, certifying to the ability and integrity of the armorers who had conducted the original inspection, and saying:

"My instructions to them were to inspect the arms, and reject all that, in their opinion, were not good and serviceable, and in all respects fit for use in the field. I think that these instructions were complied with. The arms were offered to me at a time when the demand for arms was most imperative, and it was deemed desirable to accept them, to meet, in part, the pressing demand. Comparing the arms with those of our own manufacture, none would pass inspection, and it was not supposed that they should be subjected to any such standard; but that all that were passed on inspection would prove good and serviceable, was believed. Examining two boxes of these arms in store, I do not find them to have the radical defects com-

plained of, nor can I account for the very different report of their inspection at camp, and that made to me by my inspectors. I find the sights are soldered on, but on tapping twenty of them with a hammer sufficiently hard to dent them, none were found to come off, or even started."

On the 20th of March, 1862, the Chief of Ordnance informed the Secretary of War that he deemed it his duty to withhold payment of the above voucher for $19,171.25, given by Lieutenant Treadwell to Justice, until the matter could be investigated. He submitted to the secretary all the papers on the subject, and suggested that the matter be referred to the two gentlemen (Messrs. Joseph Holt and Robert Dale Owen) who had been authorized by the secretary to audit and adjust all claims and contracts in respect to ordnance, arms, and ammunition. This recommendation was approved by the Secretary of War, who referred the voucher of March 19th, together with all the papers and reports received from the Ordnance Office, to this committee, who were then sitting in Washington. The committee proceeded to investigate the character and quality of the arms. Justice was in Washington during its session, appeared before it, and was persistent and energetic in presenting his claim. He offered no evidence, but presented several written arguments.

The first report of the committee, who declared that they "considered it proved that Mr. Justice had not fulfilled his obligation to furnish a serviceable arm to the government," was condemnatory of *all* the guns, as "not suitable in workmanship or material for the public service." Fourteen days after it was made, Justice succeeded in convincing the commissioners that in thus condemning *all* the guns they had fallen incontestably into error. He also protested that as his arms were accepted after inspection by government authority, the government could not rightfully decline to pay for all so accepted. A second report corrected the error which Justice had pointed out, and found that the "complaints of inferiority" related chiefly to 2174 rifled muskets. Accordingly the committee decided, in their second report,

that the payments theretofore made to Justice be considered as " on account," and that $15 per gun only be allowed for the 2174 rifled muskets, instead of $20, the contract price.

[In their first report they had decided that $15 was an ample equivalent for *all* the arms.]

The Second Auditor was now instructed by the Chief of Ordnance to settle Justice's account on the voucher of March 19th for $19,171.25, on " the basis of this decision;" and he accordingly stated an account between Justice and the United States, in which he charged the contractor as with an overpayment of $5 each for *all the rifled muskets already paid for at the contract price of* $20, and deducted $5 from the contract price of each of the muskets embraced in the voucher of March 19th. As the whole number of these arms was, as has been seen, 2174, the amount deducted from the face of that voucher was thus $10,870, leaving on the face of the account $8301.25 as the balance due.

On the 8th of December, 1862, Justice received from the Treasurer of the United States certificates of indebtedness amounting to $6000, and a treasury draft for $2301.25, amounting in all to $8301.25; the receipt of which he acknowledged in a letter to the Treasurer of the United States, thus:

" SIR : Have received your letter of draft, together with the following certificates of indebtedness, payable to blank, viz. :

| | |
|---|---:|
| No. 36,332 to No. '337, *i. e.*, 6 of $1000, . . . | $6000 00 |
| Draft for balance remitted, . . . . . | 2301.25 |
| Amounting to, . . . . . . | $8301 25 |

"Issued on war-warrant No. 3405 for that amount in favor of Philip S. Justice.

"Scale No. 12,051.

"Yours, &c.,

"P. S. JUSTICE.

"F. E. SPINNER,
     "Treasurer of the United States."

No other receipt was ever given by Justice for the amount, or any portion of the amount, of the above voucher of March 19th. The amount thus received left a balance of that

voucher amounting to $10,870 unpaid; and to recover this balance, Justice, on the 16th of October, 1867 (nearly five years, it will be seen, after receiving it), brought suit in the Court of Claims.

The Court of Claims found for the claimant the $10,870 claimed, and the United States appealed.

*Mr. G. H. Williams, Attorney-General, and Mr. W. Mc-Michael, Assistant Attorney-General, for the United States:*

The arms were not according to contract. They were not serviceable, nor did they equal the sample furnished by the contractor; the Court of Claims having found, as a fact, that "these arms, furnished by claimant, were not in all respects similar to the sample arm." This, although qualified by the subsequent language of the court, nevertheless goes to show a failure to comply with the condition of Lieutenant Treadwell's letter of August 17th, 1861, which provides that the muskets shall be "equal in all respects to the sample deposited with" him.

These arms were furnished directly by the claimant. The presumption is that he knew their defective character, and he cannot take advantage of a nominal inspection at the arsenal by subordinates, to screen himself from the consequences of the careful inspections of the responsible officers whose reports are above referred to. The obligation of his contract with the United States was, not that his arms should pass an inspection, but that they should be of a certain standard, and this obligation he failed to fulfil.

The result of the examination of Justice's claim by the commission, was a settlement by which he was allowed at the rate of $15 each for the defective arms.

Mr. Justice accepted the sum allowed, after having attended the meetings of the commission, and with full knowledge that it was intended as a final payment of his account; and by this action he was concluded from making any further claim on the United States. *United States* v. *Adams,** *United States* v. *Child,†* *United States* v. *Clyde,‡* rule the case.

---

\* 7 Wallace, 463.      † 12 Id. 232.      ‡ 13 Id. 35.

*Mr. J. Hubley Ashton, contra:*

Only two questions can be made in this case:

I. Whether the claimant is barred from maintaining this action by reason of having received a part of the amount due upon the voucher of March 19th? And if not—

II. Whether, upon the facts found by the Court of Claims, the government has any legal defence to this suit for the contract price of the arms?

I. The facts of this case do not bring it within the decisions in the *Adams, Child,* and *Clyde* cases cited on the other side.

1. The claimant here had a valid and regular executory contract to furnish a number of arms of a certain description at a fixed price. It was made upon the exhibition of a sample, which proved satisfactory to the agents and experts of the government. The arms were to be inspected by those agents and experts according to that sample; and they were to be rejected if found unsatisfactory, and accepted if found satisfactory. Arms of the kind contracted for were delivered, and upon full inspection by the experts of the United States, were accepted and appropriated to the contract. Regular vouchers, officially executed by the inspecting officer, were issued to the contractor. All these vouchers, except one, were duly paid, and the transactions closed.

Complaints being afterwards made against the arms by the troops, the Ordnance Bureau stopped the payment of this voucher. The arms yet in store were reinspected by Lieutenant Treadwell, a trusted officer of the Ordnance Department, who made the contract; and he again certified to their character and quality as conformable to the contract. Then an investigation is undertaken by a board of civilians. Inspections directed by them also show the arms to be on an average equal to the sample. They first make a report, condemning all the claimant's arms as unserviceable, and suggesting a deduction from the whole contract price of the entire lot, and then, nearly a month after, they take this back, and find that only about half of the arms had been

the subject of complaint. This report, on its face, is founded on ·a misconception of the contract of the claimant, viz. : that it was to furnish what they call ·a " serviceable " arm, when he expressly stipulated to supply an arm equal to the sample. When the claimant exposes the error of the first report, he protests· against any repudiation of the contract on the part of the government. Afterwards he receives, in ·due course of business, from the Treasury Department, a draft for $2301.25 and certificates of indebtedness for $6000, and, in a letter to the United States Treasurer, he *acknowledges the receipt of this draft and these certificates, amounting in all to* $8301.25. He gives no other receipt or acquittance. He is not required to take the treasury draft and the certificates of indebtedness, or·the amount payable on them, in full satisfaction of the whole·claim, and he never acknowledged that amount to be in full satisfaction of the whole claim. No such condition is imposed or fulfilled. Plainly, · then, the doctrine of the *Adams,* the *Child,* and the *Clyde* cases do not apply.

In the *Child* case, Miller, J., by words carefully chosen and expressive, rests the decision upon the effect of the *receipt in full,* required by the government before payment, and executed by the claimant contemporaneously with the payment of the amount allowed. Bradley, J., in the *Clyde* case does the same.

2. But there are other legal differences between this case and the preceding cases, which render the decisions in the latter inapplicable to the former.

The nature and character of the demand here involved were different from those asserted in the cases cited. The present demand here was for an ascertained and liquidated, and an undisputed amount. It was liquidated by the legal voucher of the proper officer, acknowledging the fact of the. contract, the receipt of the arms, their character as in compliance with the contract, the price payable, and the sum due It was liquidated in the full and absolute sense of the rule of the common law, that the payment of a smaller sum *cannot* be an accord and satisfaction of a larger debt which is fixed

and liquidated.   By that rule, such a debt as this cannot be discharged by the payment of a less sum, even though it be acknowledged to be received in full satisfaction.   This is well settled by the old and authoritative case of *Cumber* v. *Wane*, reported by Strange,* to be found with notes in 1 Smith's Leading Cases.†   *A fortiori*, it cannot be discharged by the receipt of a less sum, which is *not* agreed to be taken in full satisfaction.

Neither in the *Adams*, nor the *Child*, nor *Clyde* case was the claim liquidated in any absolute sense.   In the *Child* case, Miller, J., speaks of the claim as " an unliquidated and controverted demand."   And in the *Clyde* case the amount was not liquidated until the account was stated by the quartermaster at the reduced rate of the Quartermaster-General.

But this was also an undisputed claim.   Undisputed in a legal sense.

The theory of the government would appear to have been, that a better or different contract ought to have been made than was made, or that the claimant ought to have furnished better arms than the inspectors were willing and bound to accept, or than the agreement provided for.

The proceedings of the accounting officers, made by instructions from the Chief of Ordnance, cannot be presumed to have been known to the claimant.   But if they could be, the character and amount of the deduction from the face of the voucher preclude the idea that he took, or meant to take, the reduced amount in satisfaction of this debt.   By the manner of stating this account in the auditor's office, the government proposed to enforce *restitution* of over $8000 already in the pocket of the claimant, for arms not embraced at all in this voucher.   A reduction was made of the price, not only of 472 muskets in this voucher, but of over 800 *other* muskets long since paid for; and the supposed overpayment on account of these latter was deducted from the amount certified to be payable in the last voucher.   Justice could not, in receiving this parcel of the amount due, have

---

* 1 Strange, 426.                    † Part 1, p. 556.

meant to acquiesce in this arbitrary action in respect to his debt, and intended to abide by it. For what was the proceeding, but the assertion by the government of a claim against this party for damages for an alleged breach of warranty, the adjudication of that claim in its own favor, and the execution of that judgment out of the money due the claimant in its own hands?

The appearance of the claimant before the Ordnance Board cannot prejudice his right to recover.

The board took cognizance of the matter upon the action of the War Department. The claimant protested before it that, as his arms were accepted after inspection by government authority, the United States could not rightfully decline to pay for all so accepted. In other words, he denied there, as he had the right to do, that there was power anywhere to release the government from the obligation of its contract with him; though he was, at the same time, not unwilling to aid the board or the War Department in any proper investigation of the facts of the case.

The board fell into two errors in regard to facts connected with the transaction. One (in regard to the number of arms complained of) was corrected; the other (in regard to the actual terms of the contract) remained uncorrected, apparently, on the face of their report to the Ordnance Bureau.

Their report was rendered to that bureau. The claimant received nothing from them; was not required to receive anything or to assent to anything; and did not assent to anything.

He cannot, of course, be affected by the action of the accounting officers, under orders of the Ordnance Bureau.

II. Have the United States, independently of the theory of satisfaction, any legal defence to this claim?

1. There is no dispute in regard to the fact and terms of the contract, or that it was made by competent authority of the Ordnance Department. Nor will it be denied that where a party offers to furnish articles like guns to the government, whose officers are experts, subject to the inspection of those officers by a sample delivered and examined at the time,

and, after acceptance of the offer, the guns are delivered and inspected, approved and received in good faith, the government is concluded by the determination of its official inspectors and advisers, and cannot withhold payment of the agreed price on the ground that the guns were not suitable to the public service. It has a right to reject and refuse to pay for all arms disapproved in good faith by its inspectors, as not conformable to the sample. But it is bound to pay for all actually approved and accepted in good faith by these agents. As the contractor cannot complain of the decision of the inspectors, rejecting his arms for want of conformity to the sample, so the government cannot repudiate the action of these inspectors in receiving the arms, as, in their judgment, equal to the sample.

Even if the reports of the inspection of the arms in the hands of the regiments in the field were competent legal evidence of their condition, they would be entitled to little or no consideration; for, independently of the abuse to which all arms in the hands of raw troops at that period were necessarily subjected, it is well known that the volunteers of that day all desired to be armed with muskets manufactured by the government; and that this did, in point of fact, lead to unfair treatment of other arms.

The idea of fraud or collusion between Justice and the inspectors in this case is not and cannot be pretended.

Yet, further, there was no express warranty by Justice of the quality of the sample arm deposited with Lieutenant Treadwell. That officer thought the sample arm a serviceable one, but Justice never warranted it as such. The government might have chosen to require a warranty, but failing to do so the rule of *caveat emptor* must govern. The case shows, however, affirmatively, that Lieutenant Treadwell and the other trusted inspectors of the government regarded the sample as a good, serviceable arm; and fully believed that as all the arms received were equal to the sample, they were likewise suitable and serviceable weapons.

2. Nor has the Court of Claims found that any of the arms were *not* " good, serviceable arms, fit in all respects for

use in the field." The court has found that the sample arm "was not equal to the Springfield rifle," and that "the Justice arms were far from being a first-class arm." But that might well be, and yet the arms might nevertheless have been good and serviceable. Indeed, Lieutenant Treadwell states that while they were inferior to the Springfield arm, and could not have passed inspection if subjected to *that* standard, he believed they would prove "good and serviceable."

3. But, lastly, the Court of Claims has found, affirmatively, that these arms, while not in all respects similar to the sample arm, were, on an average, not inferior (*i. e.*, were equal in quality) to the sample.

If this finding can be interpreted as meaning (which we doubt) that some of the guns were not equal to the sample, as it does not show how many were so inferior to the sample, nor how much less they were worth than the contract price, the finding can be of no avail to the United States in maintaining this defence. The finding is, therefore, for all the judicial purposes of this case, equivalent to an ascertainment that all the guns were equal in quality to the sample arm.

Mr. Justice DAVIS delivered the opinion of the court.

It is impossible to escape the conclusion, after reading the evidence which the Court of Claims incorporates with its finding of facts in this case, that the arms obtained by the government from Justice were unserviceable and even unsafe for the troops to handle, whether they were equal to the sample arm furnished by him or not. It is true they had been accepted by Lieutenant Treadwell, with whom the contract of purchase was made, after inspection by subordinates appointed by him, but when difficulty arose in relation to them he said, in justification of his conduct, and to show his interpretation of the contract, that he had instructed these inspecting officers to reject all the arms that, in their opinion, were not good and in all respects fit for use in the field. That the duty with which these officers was charged

was, to say the least, negligently performed is evident from the result of the subsequent inspection which was ordered. This inspection was in response to serious complaints from three regiments of Pennsylvania volunteers which had been armed with the muskets in controversy. The arms of each regiment were inspected by a separate commissioned officer of experience, and all united in condemning them as worthless, and, indeed, dangerous to those using them.

In this state of case, the Chief of the Ordnance Bureau informed the Secretary of War that he deemed it his duty to withhold payment of one of the vouchers given for these arms until the matter could be further investigated, and recommended reference of the entire subject to the commission then sitting in Washington, which had been constituted by the proper authority " to audit and adjust all contracts, orders, and claims on the War Department in respect to ordnance, arms, and ammunition." In accordance with this recommendation the case was referred to this commission, which, after full investigation, and a patient hearing given to Justice, reported that he had not fulfilled his obligation to furnish " a serviceable arm ". to the government, and fixed a basis on which the account should be settled. This basis of settlement was adopted, and in accordance with it the Secretary of the Treasury, on the 8th of December, 1862, pursuant to a requisition of the War Department, drew his warrant on the Treasurer of the United States in favor of Justice for the amount found due by the accounting officers, which was transmitted to him, and receipt of it acknowledged by letter. After waiting until the five years' limitation to actions of this kind had nearly expired, he brings this suit to recover the balance of the claim, according to the original contract price, and the question is, can he maintain it ?

In the nature of things, during such a war as we have just passed through, contracts would in many instances be made by some of the numerous subordinates intrusted with that duty, in disregard of the rights of the government, or if properly made, would be so unfaithfully executed that the

public service would suffer unless their further execution were arrested. Although every just government is desirous of making full compensation to its creditors in all cases of fair dealing, it cannot afford to recognize this rule where an imposition has been practiced upon it. Of necessity it acts through agents, and cannot, therefore, assure its own protection as natural persons in dealing with each other. What, then, was the proper course for the government to pursue in relation to these disputed claims? To pay them, in the existing condition of the country, would set a bad example and lead to the most ruinous consequences, and to withhold payment altogether until Congress or the Court of Claims should act, would be, in case the claim should prove to be meritorious, a hardship. Common fairness required that some mode should be adopted for the speedy adjustment of these differences between the creditor and the government, and what better mode for the accomplishment of this object than the appointment of a commission of intelligent and disinterested persons to hear the respective parties and to settle the allowance to be made? We know by the history of the times, that several commissions for this purpose were appointed during the war, and the record discloses the fact that when this controversy arose there was one sitting in this city, constituted by the Secretary of War under the authority of the President, to audit and adjust claims of like character. It is fair to presume, in the absence of anything in the record to the contrary, that the creation of this commission was a necessity produced by the number and magnitude of the claims presented to the Ordnance Bureau which the head of it deemed unjust, and was, therefore, unwilling to pay. This commission, like all others with similar authority, possessed no judicial power, nor did it attempt to exercise any. It could not compel a claimant to appear before it and submit to its action, nor would its decision, in case there were no adversary party, have any conclusive effect. If, on the contrary, the party whose claim was disputed went before it, participated in its proceedings, and took the sum found to be due him without protest, he can-

not afterwards be heard to say that he did not accept this in full satisfaction of his demand. This voluntary submission and reception of the money is an acceptance on the part of the claimant of the mode tendered him by the government for the settlement of his disputed claim, and precludes him from any further litigation.

It is always in the power of parties to compromise their differences. One way of doing this is by arbitrators, mutually chosen, but from such submission neither party is at liberty to withdraw after the award is made. The condition of the government creditor is better than this, for if dissatisfied with the allowance made him by the commission, he can refuse to receive it, or can accompany his receipt of it, if he chooses to take it, with a proper protest. This protest is necessary to inform the government that the compromise is rejected, and that this rejection leaves the claimant free to litigate the matter in dispute before the Court of Claims. If with this knowledge and under these circumstances the money is paid, there can be no just cause of complaint on either side, and the status of the parties is not affected by anything which transpired before the commission.

These views dispose of this case. If it be conceded that the guns obtained from Justice were equal to the sample furnished, still it is manifest they were not a serviceable arm, and were besides unsafe, and that the government withheld the payment of the voucher because the contract, in the opinion of the Ordnance Bureau, was unfaithfully executed. The contract, with the accompanying papers, were referred to the ordnance commission. Justice appeared before it to contest the position of the government, and, although he offered no evidence, argued his case in writing. And as if to leave no doubt of his intention to abide the result, he succeeded, two weeks after the commission had reported on the matter to the Chief of Ordnance, in getting an error against him corrected. And when this was done, and the account stated in conformity with this correction, he receives the amount allowed him without an intimation of dissatisfaction. It is difficult to suppose that at this time

he had any other purpose than to acquiesce in the decision which was made. If his purpose were different, why the long delay in instituting suit? It is hard to believe that the course subsequently taken was not the result of an after-thought.

The recent cases in this court of the *United States* v. *Adams* and the *United States* v. *Child* are like this in principle, although they contain some elements not applicable here.

JUDGMENT REVERSED and the cause remanded to the Court of Claims, with instructions to DISMISS THE PETITION.