# CASES

## ARGUED AND DETERMINED

#### IN THE

## UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

### THE FULLERTON.

(Circuit Court of Appeals, Ninth Circuit. December 7, 1908.)

#### No. 1,557.

1. SEAMEN (§ 29*)—PERSONAL INJURIES—UNSEAWORTHINESS OF VESSEL.

In view of Rev. St. § 4461, as amended by Act Dec. 21, 1898, c. 28, § 11, 30 Stat. 758 (U. S. Comp. St. 1901, p. 3095), which makes it a penal offense to knowingly send an American vessel to sea in the foreign or coastwise trade "in such an unseaworthy state that the life of any person is likely to be thereby endangered," and the purpose of which is to protect seamen, a seaman will not be held to have assumed the risk from such unseaworthy state so as to preclude a recovery from the vessel or owner for an injury resulting therefrom, but the vessel by going to sea in violation of the statute assumes all risks which may result therefrom.

[Ed. Note.—For other cases, see Seamen, Dec. Dig. § 29;* Master and Servant, Cent. Dig. § 592.]

2. SEAMEN (§ 29*)—PERSONAL INJURIES—LIABILITY OF VESSEL.

A sailing vessel which, before starting for a voyage from San Francisco to Hawaii laden with oil and in tow of a steamer, was equipped with a secondhand anchor chain, used as a part of the towing line in accordance with custom, the links of which did not fit the compartments of the wildcat, on which it was wound, designed to prevent it from slipping, and therefore were not securely held thereby, but slipped when the line was subjected to severe strain, was unseaworthy in that respect, and liable to a seaman who, without negligence on his part, was injured as a result of such insecure fastening, it not being shown that a chain which would fit the wildcat could not have been procured.

[Ed. Note.—For other cases, see Seamen, Dec. Dig. § 29.*]

3. SEAMEN (§ 29*)—PERSONAL INJURIES—CONTRIBUTORY NEGLIGENCE.

The mate of a vessel being towed in the night in a heavy sea, who was injured while directing and assisting in lashing the anchor chain, used as part of the towline, to the towing bitt after the former lashing had parted and the chain had begun to slip on the windlass, held, on the evidence, not chargeable with contributory negligence.

[Ed. Note.—For other cases, see Seamen, Dec. Dig. § 29.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

167 F.—1

4. SEAMEN (§ 11*)—MEDICAL TREATMENT—FAILURE TO PROVIDE PROPER TREATMENT FOR INJURED SEAMAN.

Libelant, who was mate of a sailing vessel on a voyage from Port Harford, Cal., to Kihei, Hawaii, in tow of a steamer, was injured in the course of duty when 582 miles out from Port Harford and from 1,500 to 1,600 miles from Kihei. Libelant's arm was crushed in such manner that surgical skill was necessary to properly treat it and he requested to be taken back at once to Port Harford for treatment, there being no surgeon on board. This the master refused to do, nor did he communicate with the master of the towing steamer on the subject, but proceeded on the voyage to Kihei, which was reached in about 10 days, libelant's arm being then in such condition that amputation was necessary. Both vessels carried cargoes of crude oil. The wind was favorable for a return to Port Harford, which probably could have been reached in 3 or 4 days. *Held*, that it was the duty of the master under the circumstances to return at once with libelant to Port Harford unless the steamer would take him back, and that his failure to do so rendered the vessel liable in damages. Gilbert, Circuit Judge, dissenting.

[Ed. Note.—For other cases, see Seamen, Cent. Dig. § 187; Dec. Dig. § 11.*

Rights and liabilities of seamen as to medical treatment, see note to The Cuzco, 83 C. C. A. 186.]

5. DAMAGES (§ 132*)—PERSONAL INJURY—REASONABLENESS OF AWARD.

An award of $17,500 for a personal injury to the first mate of a vessel earning $150 per month, which resulted in the loss of his right arm and entailed much pain and suffering, *held* not excessive.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 379, 390; Dec. Dig. § 132.*

For personal injuries as affected by plaintiff's character and condition, see note to Metropolitan St. Ry. Co. v. Kennedy, 27 C. C. A. 133.]

Appeal from the District Court of the United States for the Territory of Hawaii.

In Admiralty. Libel in rem, in the District Court for the Territory of Hawaii, against the American barkentine Fullerton and claimants, to recover damages in the sum of $50,000 for personal injuries received by libelant on a voyage from the port of San Francisco via Port Harford, to the port of Kihei, territory of Hawaii. Decree in favor of the libelant for $17,500. Claimants appeal.

W. S. Burnett and A. Lewis, Jr. (Donzel Stoney, Page, McCutchen & Knight, and Smith & Lewis, of counsel), for appellants.

E. C. Peters and S. H. Derby (E. B. McClanahan and E. A. Douthitt, of counsel), for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge. The libel in this case was filed in the District Court for the Territory of Hawaii by Henry Winthof, the first officer of the American barkentine Fullerton, against the barkentine and claimants, to recover for personal injuries received by him while in the performance of his duties on board the vessel.

It appears from the evidence that the barkentine Fullerton, owned by the Mission Transportation Company of Los Angeles, Cal., departed from the port of San Francisco on December 19, 1906, in tow of

the steam tug Monarch. On December 21, 1906, at a point from five to eight miles off Port Harford, the tow was transferred to the steamer Lansing, and by the latter vessel the barkentine was towed to Kihei, Island of Maui, one of the Hawaiian Islands, arriving at Kihei at 1:30, January 3, 1907. The Fullerton is a four-masted sailing vessel fitted for carrying oil. Her gross tonnage, as appears from the government register, is 1,554 tons, and her net tonnage is 1,494 tons. The steamer Lansing, as appears from the same record, is a vessel of 4,560 gross tons and 3,428 net tons. On the voyage in question both vessels were laden with oil, the Fullerton having on board 15,500 barrels and the Lansing 40,000 barrels. When the Lansing took the Fullerton in tow off Port Harford on December 21st the towing hawser of the Lansing was connected with about 20 fathoms of the port anchor chain of the Fullerton. The chain came on board the Fullerton leading through the hawse pipe on the port side, passed aft near the towing bitt, and then over the wildcat of the windlass on the port side, down through the spurling gate or deck pipe into the chain locker, where the end of the port anchor chain was connected with the starboard anchor chain by means of a large shackle. The wildcat is part of the windlass, and has a mechanism for holding the chain consisting of compartments or divisions on its outer circumference for receiving the links of the chain. To make the holding device effective, it is necessary that the links of the chain shall correspond in length with the length of the compartments or divisions of the holding mechanism, so that each link of the chain fitting into a compartment shall lie securely and each alternate link be caught and firmly held by the shoulders of a compartment. When the size and shape of the link correspond to the size and shape of the compartment, the wildcat becomes an exceedingly effective holding device, whether the windlass is revolving or at rest; but in the present case the lengths of the links of the port anchor chain did not correspond to the lengths of the compartments of the port wildcat. The lengths of the compartments were each 10 inches, while the lengths of the links of the anchor chain varied from 11¼ to 11¾ inches, so that the ends of the links as they were drawn around the wildcat projected over the ends of the compartments, and the holding device was not brought into play, or, at best, only to a limited extent.

When the Fullerton was taken in tow by the Lansing off Port Harford, her port anchor chain, as part of the towing line, was further secured by lashing the chain to the towing bitt a few feet in front of the windlass. This lashing was done by the crew under the direction of the appellee as first officer, and under the supervision of the second officer and master, the latter being on the forecastle head at the time with the megaphone, through which he was communicating with the Lansing. The lashing was done with an inch and a half rope, which had been previously used for a like purpose when the barkentine was in tow of the tug Monarch. The appellee proposed to take a new 3¼ inch rope for the lashing on this occasion, but he was told by the master that it was not necessary to waste good rope; that he could use the old rope for that purpose, and because the mate, who saw the chain

slipping, protested that it might be dangerous and somebody get hurt, he was told by the master that he could go below; that he (the master), and the second mate would attend to it. The Lansing, with the Fullerton in tow as described, on December 21st proceeded on the voyage to Kihei. At about 10 p. m. of the evening of December 24th, at a distance of about 582 miles from Port Harford, and between 1,500 and 1,600 miles from Kihei, the Fullerton pulling heavily on her tow and running into a choppy head sea, the man on the lookout notified the appellee, who was then on the poop; that the chain was slipping over the windlass. The appellee called his watch together and proceeded to the forecastle head, where it was discovered that the lashing which had fastened the chain to the towing bitt had carried away and had been drawn forward into the hawse pipe. The appellee took the new rope which he had proposed to use when the lashing was first made, and with the assistance of the crew proceeded to again lash the chain to the towing bitt. This towing bitt is about 3½ feet square and about 4 feet high. It is on the forecastle head, about 3½ feet forward of the windlass, and extends down through the deck to the keelson, into which it is built. The port anchor chain leading straight from the port hawse pipe to the port wildcat passes within about 12 inches of the port side of the bitt. The appellee took the new rope, and with the assistance of the crew made it fast to the chain near the forward end of the bitt, then passed it around the bitt to the chain near the after end of the bitt, where the rope was passed around the chain and returned around the bitt to the forward end. Here the rope was again passed around the chain, and back around the bitt, and so on, the rope being passed backward and forward around the chain at the two points forward and aft and around the bitt, drawing the chain to within about 6 inches of the bitt. While this work of lashing the chain to the bitt was going on, the appellee was standing on the port side of the chain near the after end of the bitt, directing the work and assisting in making the end of the rope fast to the chain at that point. The rope had been passed around the bitt a number of times when the chain, under a heavy towing strain, suddenly jumped and slipped over the wildcat just as the appellee was connecting the end of the rope with the chain at the after end of the bitt. The jumping and slipping of the chain carried appellee's right arm between the chain and the bitt, where it was jammed and crushed. Members of the crew undertook to release appellee's arm by prying the chain away from the bitt with the capstan bar without effect. The lashing was then cut away and appellee's arm released. The appellee was removed to the cabin. It was afterwards discovered that the injuries to appellee's right arm consisted in breaking the two bones of his forearm about the middle of the lower third and dislocating the bones of the wrist.

The appellee requested the master to return to Port Harford for medical assistance, stating that he had a very bad arm. The master said he knew, but he could not return; he could not cut loose from his tow. The steward was called, who washed the injured arm, and under the direction of the master it was placed in splints. On ar-

riving at Kihei nine days later, the appellee was removed from the vessel and taken to Mahululani Hospital at Wailuku, where, on January 6th, his arm was amputated. The surgeon performing the operation designated the point of amputation as at the middle of the upper third of the arm proper. In about a month the appellee was removed to the Queen's Hospital, and on April 9, 1907, he was discharged from that hospital. While the appellee was still in the hospital he brought the present libel against the barkentine Fullerton to recover damages in the sum of $50,000.

The first cause of complaint alleged in the libel is that the use and employment of the anchor chain by the Fullerton for towing purposes in the manner described was negligent and careless, for the reason that it was unsuited, improper, and unsafe; that the links of the chain could not and did not fit the notches, grooves, or indentures of the wildcat; and that in lashing and making fast the anchor chain to the towing bitt, and while the libelant was in the exercise of due and proper care, the chain slipped over the wildcat and pinioned libelant's right arm against the bitt, thereby bruising, mashing, and breaking his arm and producing the injuries for which he seeks compensation. The second cause of complaint alleged is that after the injury to libelant the master of the Fullerton, in disregard and violation of his duty and obligation to libelant to return to Port Harford for the purpose of providing libelant with proper and sufficient medical attention and care, continued on the voyage to Kihei; that as a result of the injuries to libelant, and because of the want of proper medical attention, and by reason of the failure and neglect of the master to return to Port Harford, where the libelant might have received proper and sufficient medical attention, libelant's arm was in such condition that upon the arrival at Kihei it was necessary, in order to save libelant's life, to amputate his arm at a point about four inches above the elbow.

The answer of the libelees, so far as it is necessary to be noticed, alleges that libelant was not injured by reason of any negligence or carelessness of the vessel or owners or master, but solely through the negligence, carelessness, fault, and lack of due care and caution on the part of the libelant; that prior to the time of the departure of the Fullerton from the harbor of San Francisco, and prior to the departure of the vessel from Port Harford for the voyage to Kihei, the libelant had a full, thorough, and accurate knowledge and acquaintance with the anchor chains and windlass of the Fullerton, and with the mechanism and appliance of the windlass and a part thereof known as the "wildcat," and the functions and purposes thereof, and the purposes and uses and operation of the wildcat in connection with the anchor chain while in the performance and operation of the towing of the Fullerton, and in the proper fitting of the links of the anchor chain into the indentures and grooves or notches in the wildcat, and had full, thorough, and accurate knowledge and acquaintance with the length of the links of the anchor chain and the size of the grooves of the wildcat, and also of any misfitting of the links of the anchor chain into the indentures of the wildcat, if any misfitting there was, and

the consequences and liabilities arising therefrom and thereby in the case of the towing of the Fullerton by means of said anchor chain, wildcat, and windlass; that on December 24, 1906, at about 10 p. m., while the Fullerton was proceeding on her voyage in tow of the steamship Lansing, the night being dark and rainy, and the wind and head sea causing the Fullerton to pull heavily on her towline and to pitch and dive into the seas, the libelant was guilty of great and gross negligence and carelessness in attempting to lash and make fast the anchor chain of the Fullerton to the towing bitt without signaling to or causing the said steamship Lansing to slow down and slacken up and ease the strain on the towline leading from the Lansing to the Fullerton; that at the time of the injury to the libelant the Fullerton was about 582 miles from Port Harford on her voyage to Kihei in tow of the said steamship Lansing, and that had the Fullerton put about and returned to Port Harford she would have been compelled to cast off her towline from the steamship Lansing and proceed back to Port Harford by means of her sails, she having no other means of power of returning, and without any assistance of a tow by the steamship Lansing; that, the winds being uncertain and variable, the master of the Fullerton decided that it was more advisable, judicious, and safe to proceed a longer distance to the port of Kihei with the certain and reliable tow of the steamship Lansing than attempt to sail back a shorter distance to Port Harford with uncertain, variable, and unreliable winds, believing that the Fullerton would in all probability reach the port of Kihei sooner and with greater dispatch with the aid of the tow of the steamship than by attempting to sail back to Port Harford.

Testimony upon these issues was taken by the court below, and a judgment entered in favor of the libelant for $17,500. The present appeal is from that judgment. When the record reached this court the appellants (libelees) moved this court for leave to take additional testimony in the case. Upon the showing made, an order was entered allowing the taking of such testimony. This additional testimony related mainly to an alleged act of contributory negligence on the part of the libelant in failing to use a chain stopper which it is claimed would have helped to hold the chain. This chain stopper or riding chock was in front of the towing bitt. At the time of the injury to the libelant the pawl of the chain stopper was triced up, and it was contended that before proceeding to lash the chain to the towing bitt the libelant should have dropped the pawl of the chain stopper and thereby eased the strain on the chain, but the evidence taken does not support this contention. The evidence is that this chain stopper or riding chock is in direct line from the windlass to the hawse pipe, and that it is bolted to the deck with only four bolts. It is used to ease up the strain on the windlass when the vessel is riding at anchor, and in mooring and unmooring when both anchors are used. It is also used when the anchor is over the side, but it is never used for easing the strain on the windlass when the vessel is in tow using the anchor chain and the chain lashed to the towing bitt, for the reason that it is not strong enough for that purpose, and, besides, when the chain is lashed to the towing bitt it is not on a straight lead from the

windlass to the hawse pipe over the riding chock, but the chain is drawn aside at the towing bitt so that it passes over the riding chock at an angle, and if the pawl was then let down and the chain caught in the pawl the entire strain would be on the riding chock and none on the towing bitt or windlass. Manifestly the riding chock or chain stopper could not have been so used at the time of the accident with any safety to the vessel or to those employed about the windlass or towing bitt. Moreover, the chain stopper had carried away or was broken in December, 1906. Whether it was properly renewed or repaired prior to the voyage under consideration does not clearly appear. The libelant testified that he had a conversation with the master the day after sailing. He told him that the chain stopper was up. The master said, "Well, we can't use that; it won't hold anyway; it is broke; and don't let it down under any circumstances." The master does not positively deny that he made such a statement, but was of the opinion that the chain stopper was in good condition at the time of the accident. When asked why he did not tell counsel for appellants about the chain stopper prior to the trial in the court below, he made the significant reply, "I didn't think it had anything to do with it at all." After carefully reading all the testimony taken in this court upon that subject, we are of the opinion that the master's statement is correct.

We will now consider the case as it was presented to the court below. With respect to the first cause of complaint, it appears from the evidence that the specifications for the vessel when she was new called for 180 fathoms of chain. This would furnish 90 fathoms of chain for each side of the vessel. The wildcats on both sides of the vessel required the chains to have 10-inch links. When the Fullerton departed from San Francisco on the night of December 19, 1906, in tow of the steam tug Monarch, she had on board only 120 fathoms of chain, with links of various lengths from 11¼ to 11¾ inches. Ninety fathoms of this chain was taken in on the starboard side, and 30 fathoms on the port side. Twenty fathoms of the latter chain was payed out on the towing line, and 10 fathoms of the chain remained in the chain locker. The links of the chain did not fit the wildcat on either side. They were so large on the port side, where the chain was used as a part of the towing line, that, as before stated, the links projected over the ends of the compartments in such manner that the chain would slip over the wildcat under heavy strain. It appears that on the previous voyage from Port Harford to San Francisco the Fullerton lost both of her anchor chains, consisting of 180 fathoms, outside of the harbor of San Francisco. She was at anchor. Her starboard chain had been attached to a towline, but the towline had been cast adrift. When they came to heave in on the anchor chain, the anchor caught on something and carried away the port wildcat, and, as the two chains were shackled together in the chain locker and the outer end of the starboard chain was adrift, the entire chain ran out and was lost. This was between the 5th and 10th of December. It appears that there was some difficulty in finding chains to take the place of the lost chains. The master and one Frank H. Evers,

who was the agent of the company owning the vessel and who provided her equipment, testified that they were four days hunting for chains, and then finally purchased the chains which were placed on the ves-. sel just prior to sailing. These chains were secondhand chains. A new wildcat had to be made, and that also was taken on board just prior to sailing. There is no direct evidence that chains could not have been found to fit the wildcat, nor is there any evidence that a wildcat could not have been made to fit the chains that were taken on board. It is true the master testifies that if they could have got sufficient chain of the proper size they would have put it on board, and he also testifies that he could not get a chain made in San Francisco; and Mr. Evers testifies that on the first day that he knew the anchor chains were required he went to Mr. I. E. Thayer, the agent of the Lebanon Chain Works—

"and asked him how long it would take him to get us the chains here and he said it was impossible to do anything under two months, and in the way freight was coming at that time it would likely be longer. I ordered him to immediately telegraph for the chains, which was done, and we obtained the chains in a little over four months after they were ordered."

The inference sought to be drawn from this testimony by the appellants is that to obtain chains that would fit the wildcats the vessel would have been compelled to wait four months for the chains ordered from the Lebanon Chain Works, but if this was the fact it certainly could have been established by direct testimony. If no chains could be obtained either in San Francisco or at Oakland with links that would fit the wildcats, it was easy to establish that fact by direct and positive testimony, and this was not done. The testimony relative to the difficulty of obtaining suitable chains for the vessel was introduced by the appellants, and the presumption is that it was the most favorable testimony that could be produced in that behalf. In this aspect the evidence was not sufficient to show that all reasonable means had been used to obtain suitable chains for the vessel prior to her departure from San Francisco, and that the failure to secure them was because they could not be obtained under any reasonable conditions.

It is contended by the appellants that the appellee knew before the vessel left San Francisco that the links of the chain were too large for the wildcat, and that he assumed the attending risk. Evers testified that he knew the links were about an inch too large. He knew they did not fit, and he says the mate and he mentioned the fact to one another, and the mate said it would do. Evers fixes the time of this conversation in the evening when they were taking the port chain on board, and this latter act he says was between 5 and 6 o'clock. This was on December 19th, and it was dark at that time. The appellee testifies that he does not remember any such conversation; that the port chain arrived at the wharf about 6 o'clock; that he then took the sailors and engineer and carpenter, and got supper; there was no cooking on board the vessel; they finished supper about a quarter to 7 o'clock, and returned to the vessel and began taking the port chain on board at 15 minutes to 8 o'clock. It was dark. He had no opportunity of observing the condition of the port chain when it ar-

rived at the wharf, and he did not observe it when the chain was taken on board. The vessel left the dock with the tug alongside about 15 minutes past 8 o'clock, and proceeded out to sea. The master testifies that in the evening he went up town to get a portion of the crew, and the chain passed him on the way down. It was about supper time when he came down. He returned to the vessel about 7 or half past 7. He did not know whether they had finished the taking of the chain on board at that time. They pulled out from the dock a little after 8 o'clock. The taking on board of the port anchor chain was the last act in preparing the vessel for sea, and when that was completed she left the dock at a little after 8 o'clock in tow of the tug Monarch, and proceeded to sea, although the appellee understood that the vessel was to anchor in the bay and remain until morning to get the remainder of the chain. It is clear from this testimony that Evers was mistaken when he says he had a conversation with the appellee when they were taking the port chain on board between 5 and 6 o'clock in the evening. That chain was not on the dock until about 6 o'clock, and was not taken on board until 2 hours later, and there is no testimony that Evers was there at that time. The appellee testifies that he did not discover the fact that the port chain did not fit the wildcat until the next morning when the vessel was at sea. He then notified the master, who replied: "Well, mister, tell me something I do not know." The appellee then proceeded to lash the chain to the towing bitt. It had not been lashed before. This testimony is uncontradicted, and this circumstance, connected with the lashing of the chain to the bitt, taken in connection with the testimony upon the subject, leads to the conclusion that the appellee did not know that the port anchor chain did not fit the wildcat prior to the departure of the vessel from San Francisco, and under the circumstances shown by the evidence the appellee had no opportunity of leaving the vessel after making this discovery.

The defense that the appellee assumed the risk attending the use of a chain that did not fit the wildcat cannot be sustained in any reasonable view of the testimony, but the case has another aspect which should not be overlooked. The usual method of towing is with the hawser fastened to the towing bitt. The testimony in this case is to the effect that it is also common to use one of the anchor chains in towing. In such case the wildcat is used instead of the towing bitt for holding purposes, and the lead of the chain is through the hawse pipe; but when the hawser is fastened to the towing bitt the lead is over the forecastle head, and there is always danger that the vessel will take a sheer and pull the head gear out of the vessel. For a long tow the use of the anchor chain fastened to the wildcat and leading through the hawse pipe is, therefore, a proper appliance, but in such case the links of the anchor chain must fit the wildcat and make the chain secure, or otherwise there is danger that the chain under the strain of a heavy tow will slip and all the chain in the locker run out, including the chain attached to the anchor on the other side of the vessel, and when the strain comes on this chain the bow of the vessel might be pulled out. Appellee testifies that this was what occurred to him when

he saw the chain slipping over the wildcat just prior to the accident, and he hastened to lash the chain to the towing bitt. He thought the running out of the chain would endanger life and the loss of the ship. The master testified that the running out of the chain would be likely to tear up some of the bulkheads down below between the lockers, but he did not think it would come up so far as to have torn out the whole upper deck. The Fullerton was a heavy tow, and the Lansing was a large vessel, heavily laden. These two vessels pitching into a heavy sea would necessarily bring heavy strains on the towline, and if the chain could not be held on the wildcat it seems beyond question that the vessel would be in danger of receiving serious injury, imperiling the lives of those on board. In other words, the Fullerton was deliberately sent out on this long voyage in an unseaworthy condition. Section 4561 of the Revised Statutes, relating to the sending of a vessel to sea "unsuitably provided in any important or essential particular," as amended by "An act to amend the laws relating to American seamen, for protection of such seamen and to promote commerce," approved December 21, 1898 (Act Dec. 21, 1898, c. 28, § 11, 30 Stat. 758 [U. S. Comp. St. 1901, p. 3095]), provides as follows:

"If any person knowingly sends or attempts to send, or is party to sending or attempting to send an American ship to sea, in the foreign or coastwise trade, in such an unseaworthy state that the life of any person is likely to be thereby endangered, he shall, in respect of each offense, be guilty of a misdemeanor, and shall be punished by a fine not to exceed one thousand dollars, or by imprisonment not to exceed five years, or both, at the discretion of the court, unless he proves that either he used all reasonable means to insure her being sent out to sea in a seaworthy state, or that her going to sea in an unseaworthy state was, under the circumstances, reasonable and justifiable, and for the purposes of giving that proof he may give evidence in the same manner as any other witness."

In Narramore v. Cleveland, C., C. & St. L. Ry. Co., 96 Fed. 298, 37 C. C. A. 499, 48 L. R. A. 68, the plaintiff was in the employ of a railroad company as a yard switchman in its yards in Cincinnati, Ohio. While attempting to couple two freight cars he had his foot caught in an unblocked guard rail, and in his efforts to extricate the foot his right hand was crushed between the drawheads of the cars and injured so badly as to require amputation. The plaintiff had been in the employ of the railroad company for seven months. He had had nine years' experience as a railroad man. A railroad man of experience can see at a glance whether a guard rail or switch is blocked or not. There were a great many guard rails and switches in the yards where plaintiff worked. With the exception of a few where experimental blocks were used, the defendant did not use blocks in either its guard rails or switches. The plaintiff said he did not know that the guard rail in which his foot was caught was not blocked, and that he had not noticed whether the guard rails and switches of defendant generally were blocked or not; but this testimony was given no weight. The railroad company defended on the ground that the plaintiff knowing the danger has assumed the risk of the employment. A statute of Ohio required railroads to adjust, fill, or block the frogs, switches, and guard rails of their tracks, with the exception of guard rails on bridges, so as to prevent the feet of their employés from being caught therein.

Railroad companies violating the act were to be punished by a fine of not less than $100 nor more than $1,000. Judge Taft, speaking for the Circuit Court of Appeals in the Sixth Circuit, held that the purpose of the statute was to protect employés of railroad companies from a well-known danger of their service, the result of which, from the nature of their employment, they were compelled to assume, and, although an employé impliedly waives a compliance with the statute and agrees to assume the risk from unblocked switches and guard rails by continuing in the service without complaint, a court will not recognize or enforce such agreement. It was further held that to permit a company to avail itself of such an assumption of risk by its employés is in effect to enable it to nullify the object of the statute; that the only ground for passing such a statute is found in the inequality of terms upon which the railroad company and its servants deal in regard to the dangers of their employment. The manifest legislative purpose was to protect the servant by positive law because he had not previously shown himself capable of protecting himself by contract, and it would entirely defeat this purpose thus to permit the servant "to contract the master out" of the statute. In The Osceola, 189 U. S. 158, 175, 23 Sup. Ct. 483, 47 L. Ed. 760, the Supreme Court of the United States held that the law may be considered as settled upon the proposition that the vessel and her owner are, both by English and American law, liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship. Scarff v. Metcalf, 107 N. Y. 211, 13 N. E. 796, 1 Am. St. Rep. 807.

The court below placed the assumption of risk where it properly belonged in this case, when it said:

"If the ship could not make proper preparations for sea, and chose to go to sea without them, it was a deliberate assumption by her of all risks and all damages which might result from such want of preparation, which would include all damages that the crew might suffer in the way of injury through such want of preparation."

It is next contended that the appellee was guilty of contributory negligence at the time of the accident in not signaling the Lansing to slow down when the lashing of the chain to the bitt had been carried away and the appellee with the assistance of his watch was about to put on another lashing. The appellee was facing an emergency. All the conditions required immediate action to secure the safety of the ship and those on board. It would have required time to secure a light for signaling purposes, and such delay might have resulted in serious consequences, and, besides, the appellee had no authority to signal the Lansing to slow down. He did what the situation and his authority seemed to call for, and he cannot now be charged with contributory negligence in acting promptly in the emergency to secure the chain to the bitt.

It is further contended that the appellee was guilty of contributory negligence in placing himself in a dangerous position in the work of lashing the chain to the bitt. Appellee testifies that he was standing on the port side of the chain facing forward toward the bitt, to which the chain was being lashed by the crew under the direction of the

appellee. The appellants contend that he should have faced aft toward the wildcat, so that he could have observed any slipping of the chain over the wildcat, and in case it did slip to step aside out of danger. This contention is without merit. Had the appellee faced toward the wildcat, he could not have watched and directed the work of the crew in lashing the chain to the bitt. It was his duty to supervise and direct that work in every detail and see that it was done right. For that purpose his position was precisely what the situation required. In this connection it is also objected that appellee was negligent in passing his arm around the chain and his hand between the bitt and the lashing in fastening the rope lashing to the chain. It is difficult to see how he could have done otherwise in passing the rope around the chain and making the necessary hitch. We find no evidence of contributory negligence in any of this work.

With respect to the appellee's second cause of complaint, it appears from the evidence that at the time of the accident the Fullerton was 582 miles from Port Harford and between 1,500 and 1,600 miles from Kihei. The appellee, knowing the serious injury he had received, requested the master to return to Port Harford for medical assistance. Surgical skill was required to set the bones of the arm and place the arm in splints so that the broken bones would unite and the injured tissue heal. This skill the master did not have, nor was it on board the vessel, but it could have been had at Port Harford. In The Iroquois, 118 Fed. 1003, 55 C. C. A. 497, a seaman in the performance of his duty fell and broke both bones in one of his legs below the knee, and there was no one on board competent to treat the injury. This court held that it was the positive duty of the master to take him at once to some port where proper treatment could be had, and, where such a port could have been reached in time, the failure to do so, by reason of which amputation became necessary, was negligence on the part of the master which rendered the ship liable in damages for the injury. Judge Gilbert, speaking for the court, said:

"We entertain no doubt, in view of the evidence in the case and the law applicable thereto, that it was the duty of the master to bear away to some port of distress as soon as possible after the occurrence of the accident. * * * By the maritime law he (the seaman) was entitled to be healed at the expense of the ship. Reed v. Canfield, 1 Sumn. 195, Fed. Cas. No. 11,641; Harden v. Gordon, 2 Mason, 54, Fed. Cas. No. 6,047. This obligation was imposed upon the ship in consideration of the appellee's services, and his undertaking to engage in possibly perilous voyages and encounter hazards if necessary in the protection of the ship and cargo. The injury to the appellee was a serious one, and the master must be presumed to have known that it required careful and scientific treatment."

The master of the Fullerton refused to turn back for the purpose of securing proper surgical skill for the appellee at Fort Harford. His reason for refusing is stated by the appellee in his testimony as follows:

"That night after I got to bed I asked the captain, 'You better return, with this arm; you better return to port. I got a very bad arm, Captain.' He says, 'Well, I know but I can't return; I can't cut loose from this towboat.' I said, 'Well, you can signal to him.' * * * Q. What did he say? A. 'Well, we will see about that in the morning, but we cannot turn around;

your arm will be all right; we will put it in splints and dress it.' I says, 'I am afraid I have a bad arm. afraid I will lose my arm before I get there; blood poisoning might set in.' 'No,' he says, 'that will be all right; you know I can't turn around; it would cost me too much money; see how much it will cost to turn around, and the steamer would not go with me anyway.' I says. 'You don't know; signal to him and find out.' He says, 'We will see what we can do in the morning; we will have a talk.' That was all the conversation. * * * Q. Did you see the captain any more that night? A. No, sir, I did not see him until next morning. Q. What time did you see the captain the the next morning? A. It was 20 minutes to 8, sir, a. m. Q. In the morning? A. Yes, sir. Q. What was done then? A. He told me then he had signaled the Lansing, and the Lansing had signaled to them, and I asked him whether —what signals he sent to the Lansing—just asked, 'What was the matter last night?' Then he answered that I got my arm broke. 'Did you ask him to return with me, return with the ship?' I says. He said, 'No; what is the use of asking him? I know he would not return, anyway.' I says, 'You ought to try to do something with it, because my arm is all swollen up.' Then I showed him my arm and my hand, all black and swollen up. 'Then I am suffering fearful pain.' I told him, 'I am afraid of blood poisoning might set in before we get much farther; you have got a fair wind to go back; can't you go back? You got a fair wind; try to sail back.' He says, 'You are all right, in a few days, as soon as the arm is set up.' 'I am afraid, Captain, it is beyond your— It is beyond you; you haven't got medicine to put on it, or anything.' He said, 'All right, it will be all right; I will fix it up.' "

This testimony is uncontradicted by the master. His testimony is as follows:

"Q. At the time that the mate was hurt, did you consider at all the proposition of medical attendance upon the mate? A. After I had fixed his arm up, put it splints, and made him as comfortable as I could, I considered and thought the whole matter over in my room, and considered what was the best to do under the circumstances. * * * Q. Well, after the accident happened to the mate, did you continue on your voyage, or did you go back to Port Harford? A. Continued on the voyage. Q. Why did you continue on with your voyage? A. I considered we were under tow, in tow of the Lansing, and the chances were just about the same to get down to Kihei in the same time as we would if we had gone back. Q. Well, you understand, do you not, Captain, that Kihei is between 1,500 and 1,600 miles away, and Port Harford was 582 miles away? A. Yes, sir. Q. Now, you say that you considered the chances were about the same? A. Yes, sir. Q. So that you had not— If you had not gone to Kihei, but had gone to Port Harford, what would have been the motive power of the Fullerton, if you had gone to Port Harford? A. We would have had to sail. Q. Why would you have had to sail? A. The Fullerton would have gone on; at least the Lansing would have let me go; I would have had to let go the Lansing, and he would have gone on and delivered his own cargo. Q. Well, why would the Lansing have gone on? * * * A. I have instructions in case of breaking adrift from the tow, or anything interferes that the two ships cannot proceed together, each one continues on its own course. * * * Q. How is the American barkentine Fullerton rigged, tackled, and furnished with appliances relative to sailing? A. She is well fit out, well found, and always ready for sailing. Q. If you had cast adrift or parted with your tow with the Lansing, in your judgment, taking into consideration the weather conditions as they were on that day and the day following, how long would it have taken you to sail back to Port Harford, if you had so parted your tow and cast adrift from the Lansing at the time of the accident or the next morning? A. Well, that is something you cannot answer definitely. * * * Q. In arriving at your conclusion as to whether to go back to Port Harford or sail on to Kihei, what facts did you take into consideration? A. I took into consideration that if we continued to Kihei we continued under tow. Q. If you turned around to go back? A. We would have to go under our own power; that is, sail. * * * Q. What facts did you take into consideration aside from the fact that you would have to sail

back to Port Harford? A. Well, at the time of the accident, the wind was sou'west, and it would naturally go to the west and nor'west and finish up there, and blowing pretty fresh, and we could not make much headway when it got into nor'west on account of the seas and wind, and I thought that under the circumstances * * * and conditions that we would get to Kihei as soon as we would get back to Port Harford. * * * "Q. Now, what, in your opinion, would have been the probable length of time, or what would you consider under the circumstances would have been the variations in time, that you could have sailed from the position in which you were at the time of the accident to Port Harford? A. Under favorable circumstances, we would have been in Port Harford in three or four days, but again we might have been double that time that season of the year, or even longer. Q. How much longer? A. Well, you could not tell, you could form no idea. We might get there in four days, we might get there in fourteen; it is hard to tell; you don't know how the wind is going to act."

The instructions to which the master referred in his testimony as his authority in such an emergency were introduced in evidence. They were issued by the Union Oil Company of California, and addressed "Captain J. C. Kitchin, Bktn. Fullerton." What relation this company had to the Fullerton or the Lansing or the cargoes of either is not disclosed. The Mission Transportation & Refining Company was the registered owner of the Fullerton. The cargoes on both the Fullerton and the Lansing were crude oil, but the owners of these cargoes are not stated, nor is the ownership of the Lansing mentioned in the evidence. The instructions material to this case were as follows:

"When you are towed by one of our own vessels, in case the hawser should break or the weather conditions are such that they are obliged to cut the Fullerton loose, she is in a position to take care of herself, hence you would head your course for the port you started for, and the steamer will, if she can, take you up later. Regarding signals, that is a matter you can arrange with the vessels towing you."

There is no evidence in the record that the Fullerton was being towed by a vessel owned by the company that issued these instructions, but, waiving that objection, the instructions do not relate to the situation on board the Fullerton concerning which the master was called upon to act. The hawser had not parted or broken, and the weather conditions had nothing whatever to do with the injury to the appellee. The instructions were, therefore, not applicable, and it was not to be expected that instructions would have been given for such a situation. The conduct of the master under such circumstances is regulated by the general maritime law, which requires that the master shall use all reasonable exertions to secure skillful and timely attention for a seaman disabled in the service of the vessel. Brown v. Overton, 1 Spr. 462, Fed. Cas. No. 2,024; Whitney v. Olsen, 108 Fed. 292, 47 C. C. A. 331, and cases there cited; The Iroquois, 194 U. S. 240, 24 Sup. Ct. 640, 48 L. Ed. 955. It was therefore plainly the duty of the master of the Fullerton to have communicated with the master of the Lansing and ascertained what assistance he or his vessel was able to render under the circumstances. Neither of the cargoes was perishable, and there was no risk of a loss of market for either. It would seem that the Lansing could have dropped the Fullerton and taken the appellee back to Port Harford. The Fullerton

would then have proceeded under sail and later been overtaken by the Lansing, and the voyage to Kihei resumed and continued with but little loss of time. Another alternative was for the Lansing to drop the Fullerton, the latter vessel return with the appellee to Port Harford under her own sail, and the Lansing proceed on her voyage. The wind was favorable at this time for the Fullerton to make this return to Port Harford under sail, and it was likely to so continue at this season of the year, with some probable variations. The wind was ahead, as they were sailing in the direction of Kihei, which would have been a favorable wind for the Fullerton sailing in the contrary direction towards Port Harford. It is not necessary to determine which, if either, of those two alternatives should have been chosen. Either would have been better than the course adopted; but it is enough that the master of the Fullerton did not communicate with the master of the Lansing concerning either or the assistance he or his vessel might have been able to render in the emergency, but on his own judgment the master of the Fullerton determined to continue on the voyage to Kihei in tow of the Lansing. This was not doing all that a reasonably prudent person was called upon to do under the circumstances, and his failure in this respect was negligence for which the vessel is liable.

It is contended by the appellants that the judgment of the District Court in favor of the appellee for damages in the sum of $17,500 is grossly excessive. The court below took into consideration appellee's earning capacity at the time of the accident, and how far that capacity had been reduced by the loss of his arm. The evidence showed that appellee had been earning in wages and perquisites $150 a month, and was earning on the Fullerton in wages and perquisites $140 a month with the chance of making it up to $150 a month. The court estimated appellee's earning capacity after the injury to be not over one-third what it was before the injury. The court further considered appellee's expectation of life as shown by the life insurance tables, and discounted that expectation by five years for sea service. The court determined that the libelant was entitled to an amount which, at a reasonable rate of interest compounded annually, would furnish him with $1,200 per annum the rest of his life, dating from the date of the accident. The court added damages on account of appellee's intense and long-continued suffering of mind and body brought upon him through the negligence of the representatives of the ship, and found the total damages $17,500. There does not appear to be any error in this method of estimating the damages sustained by the appellee, and, as the findings of fact were fully supported by the evidence, we find no reason for reversing the judgment on that account. In Western Union Tel. Co. v. Engler, 75 Fed. 102, 21 C. C. A. 246, the plaintiff was driving along the highway when his horses struck the wire of the telegraph company, which had fallen from its proper place on the poles to within about two feet of the ground. The horses, becoming frightened, suddenly turned and ran, thereby throwing the plaintiff to the ground from the vehicle in which he was riding. By this fall he received a compound comminuted fracture of the

ankle bone of the left leg and his left foot was doubled over, both bones protruding through the flesh; he was disabled for many months, prevented from attending to his business, incurred large expense for medical attendance, and the testimony was that he would probably be permanently lame. The jury had awarded the damages in the sum of $15,000. It was objected that these damages were excessive. This court, on appeal, refused to set aside the judgment, citing the case of The City of Panama, 101 U. S. 453–464, 25 L. Ed. 1061, where that court said:

> "Damages in such a case must depend very much upon the facts and circumstances proved at the trial. When a suit is brought by the party for personal injuries, there can be no fixed measure of compensation for the pain and anguish of body and mind, nor for the permanent injury to the health and constitution, but the result must be left to turn mainly upon the good sense and deliberate judgment of the tribunal assigned by law to ascertain what is a just compensation for the injuries inflicted."

Considering all the facts of this case, we see no just ground for disturbing the judgment of the court below.

In the view that we have taken of this case, it is not necessary to consider the remaining questions raised on this appeal.

The judgment of the court below is affirmed.

GILBERT, Circuit Judge (concurring). I agree that the decree should be affirmed on the grounds alleged and the facts proven as to the first cause of action. But in view of all the circumstances disclosed in the evidence, and the law applicable thereto as defined in the decision of the Supreme Court in The Iroquois, 194 U. S. 240, 24 Sup. Ct. 640, 48 L. Ed. 955, I am of opinion that the master of the Fullerton was not negligent in proceeding on the voyage instead of turning back by sail to Port Harford.