## THE LLEWELLYN J. MORSE.

### Petition of FAMOUS PLAYERS LASKY CORPORATION.

District Court, S. D. California, S. D. April 27, 1928.

No. 2610.

**1. Shipping ⬦⟹207—Owner, to claim limitation of liability, must see that vessel is seaworthy; "seaworthiness."**

Obligation rests on owner of vessel to see that vessel is in all respects seaworthy, in order to claim limitation of liability; "seaworthiness" meaning efficiency of the vessel in materials, construction, equipment, officers, men, and outfit for the trade in which it is employed.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Seaworthy—Seaworthiness.]

**2. Shipping ⬦⟹207—Ship used for motion picture held unseaworthy at time of accident, where alterations lessened vessel's strength and top of mizzenmast was shot off (46 USCA §§ 181–189).**

Ship used for moving picture scenario, whose strength was lessened by removal of her ribs, cutting of bulwarks, and building of false and exterior hull and deck, and lengthening the masts, and which had no motive power, *held,* unseaworthy in proceedings for limitation of liability, under Rev. St. §§ 4282–4289, as amended and supplemented June 26, 1884 (23 Stat. 53–57), and June 19, 1886 (24 Stat. 79, 80), 46 USCA §§ 181–189 (Comp. St. §§ 8019–8025, 8027, 8028), at time of injuries and death of actors engaged in production of film, where top of mizzenmast had been shot off in course of producing battle scene.

**3. Shipping ⬦⟹207—Film-producing corporation held not entitled to limitation of liability for injuries and death resulting from explosion during enactment of battle scene under control of director, ship being unseaworthy (46 USCA §§ 181–189).**

Film-producing corporation, owning ship which was altered by removing ribs, cutting bulwarks, building false hull and deck, and lengthening masts for purpose of enacting battle scene for film production, *held,* not entitled to limitation of liability for injuries and death of actors resulting from explosion, under Rev. St. §§ 4282–4289, as amended and supplemented June 26, 1884 (23 Stat. 53–57) and June 19, 1886 (24 Stat. 79, 80), 46 USCA §§ 181–189 (Comp. St. §§ 8019–8025, 8027, 8028), where top of mizzenmast had been shot off, rendering ship unseaworthy, and where director, given full control and authority, ordered men into rigging before accident; use of vessel for spectacle or play not being within spirit of limitation statute.

**4. Corporations ⬦⟹397—Persons given full control in directing film held vice principals of film-producing corporation, for whose acts corporation was responsible.**

Persons to whom full control and authority were given by film-producing corporation in direction of scenes for producing film were vice principals of corporation, and corporation was chargeable with their acts, and with their knowledge and authorization of particular work to be done and the manner of its execution, since vitality of corporate principal is manifested only through its officers and agents.

In Admiralty. Petition by the Famous Players Lasky Corporation for exoneration from or limitation of liability as owner of the ship Llewellyn J. Morse. Petition to limit liability denied.

Elizabeth Robinson, of New York City, for claimants.

Lucius K. Chase and Lucius F. Chase, both of Los Angeles, Cal., for petitioner.

Silas B. Axtell, of New York City, and Eastham & Smith, of San Pedro, Cal., for claimant Harry F. Broyles.

Peter J. Youngdahl and Donald O. Larkins, both of Los Angeles, Cal., for claimants Charles Carlson, Eric R. Johnson, Ernest Olsen, and Cora B. Davis.

NETERER, District Judge. Prior to statutory regulation, the liability 'of owner of a vessel for damages at sea was limited only by his ability to pay, under the civil law as well as the maritime law. Emerigon, "Contrats a la Grosse," C–4, § 11. Oleron or Wisby or Hanse Towns suggest no restrictions. Consolato del Mare first limited liability of the owner to his share in the ship. Vinnis says the owner was not liable beyond the value of the ship and the things in it. The Hanseatic Ordinance of 1644 held the owners discharged from claims by sale of the ship to pay them. The French Ordinance of 1681 discharged the owner upon surrender of the ship and freight; a like limitation in Ordinance of Rotterdam, 1721. The sense of the French Ordinance was carried into the Commerce Code of France, art. 216, and other European and South American countries; Argentine Code, art. 1039; Brazilian Code, art. 494; Belgian Code, art. 216; Chilean Code, art. 879; German Maritime Code, art. 452; Italian Code, art. 311; Code of the Netherlands, car. 321; Portugese Code, art. 1345; Russian Code, art. 649; Spanish Code, arts. 621, 622. During the reign of George II, 1734 (7 George II, c. 15), England enacted its first limitation law. This was followed by the Merchant Shipping Act, 1854, 16–17 Victoria, c. 131; and these provisions were extended by amendment in 1862. In 1818 Massachusetts enacted laws upon the same subject. These were revised in 1836; and Maine enacted a like statute in 1831. In 1851 the Congress enacted what is now known as sections 4282–4290, R. S. (46 USCA §§ 181–195). Certain amendments were made June 26, 1884 (23 Stat. 53–57), and June 19, 1886 (24 Stat. 79, 80).

The purposes and clear intent of all limitation cases and legislation is aid to marine commerce in the encouragement of capital in the building of ships. "The great object of the law was to encourage shipbuilding and to induce capitalists to invest money in this branch of industry," said the Supreme Court, through Justice Bradley, in Norwich, etc., v. Wright, 80 U. S. (13 Wall.) 104, 20 L. Ed. 585. And again in Providence v. Hill, 109 U. S. 578, 3 S. Ct. 379, 617, 27 L. Ed. 1038: "In these provisions of the statute we have sketched in outline a scheme of laws and regulations for the benefit of the shipping interest, the value and importance of which to our maritime commerce can hardly be estimated." Nor have the amendments of 1884 and 1886 modified this purpose. The court in Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co., 271 U. S. 19, at page 21, 46 S. Ct. 379, 380 (70 L. Ed. 805), said:

"The rule of limited liability of owners of vessels is an ancient one. It has been administered in the courts of admiralty in Europe from time immemorial, and by statute applied in England for nearly two centuries. * * * Our statutes establishing the rule were enacted to *promote the building of ships,* to *encourage the business of navigation,* and in that respect to put this country on the same footing with other countries. * * * *The rule should be applied having regard to the purposes it is intended to subserve and the reasons on which it rests."* (Italics supplied.)

And in Hartford Acc. & Indemnity Co., etc., v. S. P. Co., 273 U. S. 207, at page 214, 47 S. Ct. 357, 358 (71 L. Ed. 612), the latest expression, the court says:

"These decisions establish, first, that the great object of the statute was to encourage shipbuilding and to induce the investment of money in this branch of industry, by limiting the venture of those who build the ship to the loss of the ship itself or her freight then pending."

The uniform expression of the Supreme Court with reference to like issue is of like import. See La Bourgogne, 210 U. S. 95, 28 S. Ct. 664, 52 L. Ed. 973; The Main v. Williams, 152 U. S. 122, 14 S. Ct. 486, 38 L. Ed. 381; Capital Trans. Co. v. Cambria Steel Co., 249 U. S. 334, 39 S. Ct. 292, 63 L. Ed. 631, and other cases.

The petition and the evidence show that the Llewellyn J. Morse was built in 1877, a full-rigged ship of 71 tons net register, with length of 198.2 feet, breadth of 36.6 feet, and a depth of 24.2 feet, and was purchased and thereafter transformed into a "prop" (said to be "anything that goes to decorate a set"), a replica of the ship Constitution, nicknamed "Old Ironsides," by building "false exterior hull, false decks, removal of the old masts, and the installation of three high masts and a long beam"; that the bulwarks and approximately one-third of the ribs of the ship were cut to put in gun ports, "rendering it unfit

for commercial purposes," and "necessitated that the vessel be handled carefully." After the ship was transformed into a "prop," actors were hired to act in a picture; some of these had training as seamen. The ship had no motive power, but was full-rigged and was towed by a tug to a point on the ocean off Catalina Island, California. It moved along the island with sails set. There the scenes were taken, representing a battle between other vessels and the Constitution and a fort on land.

Dynamite was put in the mainmast, mizzenmast, and foremast, about 30 or 40 feet from the tops of the masts. The masts were 140 to 160 feet high. In the scenes, shots from the vessels and from the fort were fired, and shots were supposed to hit the tops of the masts on the Constitution and break them off. In reality, blank shots were fired, and simultaneously explosives which had been placed in holes drilled in the mizzenmast of the ship in appropriate manner were exploded, causing the top of the mizzenmast to break at that point and fall. About an hour thereafter, the men were directed to go into the rigging of the ship, and upon order from Cruse, in charge of the picture, blank shots were fired, and simultaneously the explosives, which had been placed in holes drilled in the main and fore masts in appropriate fashion, were exploded, causing the tops of the masts to break at that point while the men were in the rigging, and injury and death followed.

The battle scene depicted in the scenario, the thrills of the picture in which the masts were dynamited, may enlighten:

Scene 353: " * * * Marines begin climbing to the fighting tops; the sailors take their positions beside their guns; the powder monkeys are in place. * * * "

Scene 369: " * * * A mast is shattered and begins to fall. * * * "

Scene 373: " * * * A shot strikes the rail near the center of the boat, throwing splinters in all directions and scattering the crew about the gun. At the same time a yardarm comes crashing to the deck; an officer gives an order, and men jump to the canvas and quickly clear the deck; others begin to carry the wounded away. * * * "

Scene 376: " * * * Dead are being thrown overboard and the wounded are carried below. * * * "

Excerpts from the scenario are illustrative of other scenes depicted in the progress of the picture. The continuity and the sequence are complete, one thrill after another. May it be successfully contended that the limitation statute can extend to a vessel trans-

formed from a marine commerce craft to a scene, or structure on which a spectacle or play was to be exhibited, a stage with its adjuncts and decorations, on which acting was to be done, to produce thrills in a moving picture by blasting dynamite to destroy parts of the ship, as being within the purposes "it is intended to subserve and the reasons on which it rests"? The ship was like a three-legged stool, useful only for thrills in the dramatic service. Take one leg from a stool, and part of a stool is left; take one-third of the ribs from a vessel and cut the bulwarks, and we have only part of a vessel left. A three-legged stool could stand, and a vessel deprived of one-third of its ribs and bulwarks cut could float, and in that sense the vessel *might* be within the letter of the law, but that does not bring it within the spirit of the limitation statute. See Rector v. U. S., 143 U. S. 457, 12 S. Ct. 511, 36 L. Ed. 226.

[1, 2] But, whether within the intent and purpose of the limitation act, the vessel was not seaworthy and maintained in a seaworthy condition. And this obligation rested upon the owner to see that the vessel was in all respects seaworthy.[1] Seaworthiness means efficiency of the vessel in materials, construction, equipment, officers, men, and outfit for the trade in which it is employed. The ship had been seaworthy, but its strength was lessened by removal of one-third of her ribs and cutting the bulwarks, building false exterior hull and deck, and lengthening the masts, necessitating careful handling. It had no motive power, and if it was seaworthy at the time it was towed from Long Beach to Catalina Island, all sails set at the island, it became unseaworthy prior to the injuries and death, when the top of the mizzenmast was shot off and fell.

The executive and managing officers of the petitioner, including Vice President Lasky, of New York, examined and approved the scenario, and Strite, Jaffe, Schulberg, Hoffman, and Cruse were in full charge.

---

[1] Lord v. Goodall, etc., S. S. Co., 15 Fed. Cas. 884, No. 8,506, affirmed 102 U. S. 541, 26 L. Ed. 224; Patton-Tully Transp. Co. v. Turner (C. C. A.) 269 F. 334; The Osceola, 189 U. S. 158, 23 S. Ct. 483, 47 L. Ed. 760; The West Jester (D. C.) 281 F. 877, and cases cited; The Republic (C. C. A.) 61 F. 109; The Benjamin Noble (D. C.) 232 F. 382; Eastern S. S. Corp. v. G. L. D. & D. Co. (C. C. A.) 256 F. 497. See, also, The Fullerton (C. C. A.) 167 F. 1; Cricket S. S. Co. v. Parry (C. C. A.) 263 F. 523; The Edith Godden (D. C.) 23 F. 43; The Kinghorn (C. C. A.) 297 F. 621; Hoof v. P. A. F. (D. C.) 284 F. 174. The Princess Sophia (D. C.) 278 F. 180, is in harmony with the view here expressed.

Schwartz, production manager, in charge of production on the Coast, represented the company's interest. He says: "We knew, of course, the script was written, and was to be shot as written." Again: "The script had been approved, and was to be shot as written." "The director has the authority to direct the use of explosives to produce certain effects, whether in miniature or in full effect."

Hoffman, executive manager, had the actual handling of the organization. He said the director had authority, when on location, to make such changes as he deemed advisable, unless it involved a large expenditure of money. Cruse said "that they all knew about it. We discussed it all in conference after we had started. They were all with me in the picture, and all in on the picture. They all knew about it." Cruse, director in charge on location for producing this picture, was directed to produce the picture and make it "a James Cruse production." He was given complete control and empowered to make any change, except where a considerable sum of money was required. He was a vice-principal and his acts the acts of the principal.[2]

[3, 4] To produce a screen effect, Madigan, an expert in explosives, would pass upon a certain effect, and Cruse give the order to go ahead. The camera would be set, and when all was ready the photographic effect was taken. Cruse explained the effect desired, and Madigan placed the dynamite and produced the effect. Upon the record the conclusion is inevitable that the men, upon their understanding that no mast would be shot, were by Cruse ordered into the rigging after the mizzenmast was shot.[3]

It is beyond my comprehension how the petitioner can hope to invoke the limitation statute upon the facts established, on a claim for liability for willful conduct resulting in injury and death, where the acts done were approved and authority to produce conferred and direction for certain effects given. Vitality and animation of the corporate principal is manifested only through its officers

and agents, and the policy, knowledge, and acts of such agents are those of the corporation. Persons to whom full control and authority were given were vice principals; their acts are the petitioner's acts; their knowledge the petitioner's knowledge; their authorization of the particular work, and the manner of execution, the act of the principal.

The other questions raised by the petitioner, in view of the conclusion reached, need not be discussed.

The petition to limit liability is denied.

[2] Oregon Round Lbr. Co. v. Portland & A. S. S. Co. (D. C.) 162 F. 912; The Erie Lighter 108 (D. C.) 250 F. 490; In re Jeremiah Smith & Sons, Inc. (C. C. A.) 193 F. 397; In re P. Sanford Ross, Inc. (C. C. A.) 204 F. 248; The Teddy (D. C.) 226 F. 498.

[3] The Kinghorn (C. C. A.) 297 F. 621; Hoof v. P. A. F. (D. C.) 284 F. 174; Panama R. Co. v. Johnson (C. C. A.) 289 F. 964, affirmed 264 U. S. 375, 44 S. Ct. 391, 68 L. Ed. 748; The Themistocles (C. C. A.) 235 F. 81; Grimberg v. Admiral Oriental S. S. Line (D. C.) 300 F. 619; The Fullerton (C. C. A.) 167 F. 1; The Osceola, 189 U. S. 158, 23 S. Ct. 483, 47 L. Ed. 760.