## Dunscombe v. Amfot Oil Company.

(Decided December 7, 1923.)

### Appeal from Warren Circuit Court.

1. Equity—He who Comes into Equity Must Come with Clean Hands. —Whoever appeals to a court of equity for relief must do so with clean hands, and with an apparently clear conscience, and will not receive the peculiar favor of courts of equity, where his conduct has been unconscionable by reason of bad motive, or where the result will be unconscionable.

2. Equity—Persons Repelled by Maxim Requiring Clean Hands in Court of Equity—"He who Comes into Equity Must Come with Clean Hands—The maxim that "he who comes into equity must come with clean hands" does not apply to general iniquitous conduct unconnected with the transaction and in which the adverse litigant had no connection, or to moral infirmities; but it is not essential that the misconduct shall constitute a crime punishable under the law, or be actually fraudulent, or constitute the basis of a legal action.

3. Equity—Lessor Held Not Entitled to Cancellation of Contract for Nonpayment of Rental, in View of Equitable Maxim Requiring Clean Hands—"Unconscionable."—Where lessee under oil lease sent check for rental within the time stipulated in the lease, but its local manager failed to sign it in a blank left for that purpose, and, though the lessor with slight effort could have caused a correction of the oversight, he waited until after the rent was due for the purpose of concealing the mistake, and with the apparent bad motive of bringing about a forfeiture, he was not entitled to come into equity and obtain a cancellation; his conduct being "unconscionable" within the maxim requiring clean hands.

W. O. RODES and JOHN L. STOUT for appellant.

RODES & HARLIN for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

By this equity action filed in the Warren circuit court by appellant and plaintiff below, William Dunscombe, on November 26, 1921, he seeks the cancellation of an oil lease on 26 acres of land in Warren county which he executed to S. B. Duncan on August 13, 1917. At the same time he executed a similar lease to Duncan on a different tract containing 85 acres and located in the same county. The leases were for a term of ten years from the date of execution and as long thereafter as oil and gas were produced, with the usual royalty of one-eighth of the oil to the lessor. The lessee agreed to drill

and complete a well on the leased premises within one year from the date of the leases "or pay annually in advance at the rate of 25 cts. an acre per year for each additional year such completion is delayed," and it was stipulated that the rental "shall be paid to the party of the first part in person or by check to his order, deposited in the P. O. registered letter to his address at Rockfield, Kentucky, No. 2."

By successive assignments the appellee and defendant below, Amfot Oil Company, became the owner of the two leases. No well was drilled on either of them, but the rent was promptly paid in advance on the due dates. Defendant maintained an office in Bowling Green with a local manager in charge and he, on August 1, 1921, mailed to defendant's address, as contained in the leases, a registered letter in which he enclosed two checks, one for $21.25 in payment of the rental on the 85 acres for the year from August 13, 1921, to August 13, 1922, and another one for $6.50 in payment of the rental on the 26 acres for the same year. It appears that each of the checks had the name of defendant printed thereon as drawer thus, "Amfot Oil Company per ———." In issuing the two checks defendant's manager filled out the corresponding stubs in his check book and entered thereon the date, amount and purpose of them, but by oversight he failed to write his name or any name in the blank at the bottom of the check for $6.50 issued as stated in payment of the rental on the 26 acres. In due time plaintiff received the letter, as was evidenced by his returned receipt, and the manager from that time forward labored under the impression that the rental on both leases was paid. Plaintiff presented the check for $21.25 to the bank on which it was drawn on August 9, thereafter, and either cashed it or obtained credit for it. He says that he also presented to the same bank at the same time the check for $6.50, and that it was dishonored, and that he then made inquiry to learn who was defendant's manager and whether it had an office in Bowling Green, although the check which was accepted by the bank contained all that information. Plaintiff kept the dishonored check without offering to put it in the bank "for collection" and without notifying defendant of its dishonor or the reason why. On August 23, ten days after the rent was due and payable, he wrote a letter to defendant notifying it that the rental due on the lease

of the twenty-six acres had not been paid, and, as he says therein, "I suppose you intend to abandon the contract." He then proceeded to demand an immediate surrender and cancellation of the lease and stated that unless it was voluntarily done within twenty days thereafter, he would proceed "to ask a court of equity to require same to be cancelled;" but he was generous enough in that letter to give to defendant the preference to obtain a new lease upon the same tract upon terms to be agreed upon. As an exciting circumstance to increase defendant's vigilance in obtaining a new lease, it was notified in that letter that plaintiff already had two offers from other parties to lease the land for the same purposes. It was not till after this action was filed that defendant learned of the oversight by its manager in not signing his name in the blank to the $6.50 check, and it then tendered to plaintiff the rent with accumulated interest from the date it was due, but he declined to accept it. In defense of the action the defendant relied on an estoppel based on the facts as above recited, and upon submission after preparation the court dismissed the petition, from which judgment plaintiff prosecutes this appeal.

There is an ancient as well as favorite maxim in equity jurisprudence which, Anglicized, says: "He who comes into equity must come with clean hands." It is sometimes thus stated: "Whoever appeals to a court of equity for relief must do so with clean hands and with an apparently clear conscience," and again: "He that hath committed iniquity shall not have equity." The maxim, howsoever stated, proceeds upon the theory that equity has for its purpose the dispensing of unalloyed justice, and that "no polluted hand shall touch the pure foundation of justice." The text in 10 R. C. L. 389, in discussing the scope of the application of the maxim says: "The exclusion of a plaintiff from the peculiar favors of courts of equity results equally, however, where his conduct has been *unconscionable* by reason of a *bad motive* or where the result in any degree induced by his conduct will be unconscionable either in the benefit to himself or the injury to others. This rule has been applied in a multitude of cases, and thereunder a court of equity cannot be successfully invoked to assist parties in taking advantage of their own deliberate wrong and wilful misconduct." (Our italics.) The extent of its application is stated in 21

Corpus Juris, 183-184 thus: "The maxim operates so as to exclude aid or deny relief to or from conduct which is fraudulent, illegal, or *unconscionable*. The misconduct need not necessarily be of such nature as to be punishable as a crime, or actually fraudulent, or constitute the basis of legal action. Any wilful act in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest and fair-minded men will be sufficient to make the hands of the applicant unclean. The exclusion of a plaintiff from the peculiar favors of courts of equity equally results where his conduct has been *unconscionable* by reason of a *bad motive* or where the result in any degree induced by his conduct will be unconscionable either in the benefit to himself or the injury to others." (Our italics.) In note 14 on page 183 of that citation, supporting the unconscionable conduct calling for the application of the maxim, a great number of cases are cited, including that of Bennett v. Stuart, 161 Ky. 264, and in subdivision (b) of the same note it is said: "He who prevents a thing being done shall not avail himself of the non-performance he has occasioned." A number of cases are cited supporting that statement. Also in subdivision (a) of note 89 to the text on pages 180 and 181 of the same work it is said: "One who comes into a court of conscience to take advantage of a forfeiture, must come with skirts free from blame," and in support of that statement the cases of Wilson v. Bird, 28 N. J. Eq. 352, and Weidman Silk Dyeing Co. v. East Jersey Water Co., 88 N. J. Eq. 397, are cited.

But the maxim does not operate so as to repel all sinners from courts of equity. It does not apply to general iniquitous conduct unconnected with the transaction, and in which the adverse litigant had no connection nor was otherwise interested. Neither does it take cognizance of all moral infirmities, since courts of equity are not primarily engaged in the moral reformation of the individual citizen. It, therefore, employs the maxim *only* when a litigant appeals to it for either affirmative or defensive relief through the application of sound principles of justice. In such appeals equity will scrutinize his conduct with reference to the transaction as it affects his adversary, and if it is fraudulent, illegal or *unconscionable* he will be dismissed and the doors of the court will be closed to him. It is not essential for that purpose that the

misconduct shall constitute a crime, punishable under the law, or be actually fraudulent, or constitute the basis of a legal action, since, as we have seen, if it be such as "would be condemned and pronounced wrongful by honest and fair-minded men," it will be sufficient to render the hands of the litigant unclean within the meaning of the maxim. See also R. C. L., *supra*, 391-2. Having said as much, it now remains to see whether plaintiff's conduct in this case brings him within the bar of the maxim.

In the first place he is seeking a forfeiture, and he bases his right to do so, not on any intentional violation by defendant, but upon what the record abundantly discloses was an innocent oversight. A *bona fide* but ineffectual effort was made to pay the rental within the time stipulated in the lease, and that fact was plainly manifested to plaintiff. In a number of ways and without any (or at most with but slight) effort on his part he could have caused a correction of the oversight, or could have ascertained whether there was no intention to make payment. He could have written a letter before August 13 (due date) instead of waiting until the 23rd of that month, ten days after that time. He could have offered to deposit the incomplete check in the bank "for collection" so that the purpose of defendant could have been ascertained on its presentation. He could have gone to defendant's office without the slightest inconvenience and notified it of the mistake and ascertained its intentions with reference to continuing the lease; but instead of doing any of those things he concealed the mistake with the apparent "bad motive" of bringing about a forfeiture and thereby prevented defendant from correcting the mistake in time to prevent it. As measured by what "honest and fair-minded men" would condemn as being wrongful, we unhesitatingly conclude that his conduct in secreting the mistake, and never in any manner calling defendant's attention to it, not even in the letter which he wrote ten days after the rent was due, was "unconscionable" within the meaning of the maxim under consideration, and that the court properly dismissed his petition.

Wherefore, the judgment is affirmed.