**UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION v. WESTERN UNION TELEGRAPH CO.**

(Court of Appeals of District of Columbia. Submitted February 9, 1926. Decided June 1, 1926.)

No. 4322.

**I. United States ⬤⇒52½, New, vol. 19A Key-No. Series.**

United States Shipping Board Emergency Fleet Corporation, incorporated under Act Sept. 7, 1916 (Comp. St. § 8146a et seq.), is not entitled to government rate on telegraph messages, under Rev. St. § 5266 (Comp. St. § 10075), notwithstanding Act June 15, 1917 (40 Stat. 182).

**2. States ⬤⇒84—United States ⬤⇒52½, New, vol. 19A Key-No. Series.**

When a state or general government associates itself in a corporate capacity with private persons, it becomes in the eyes of the law a private person, bound accordingly.

Appeal from the Supreme Court of the District of Columbia.

Action by the Western Union Telegraph Company against the United States Shipping Board Emergency Fleet Corporation. Judgment for plaintiff, and defendant appeals. Affirmed.

E. M. Allison, Jr., and Geoffrey Goldsmith, both of Washington, D. C., for appellant.

P. E. Lesh, of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

VAN ORSDEL, Associate Justice. The Western Union Telegraph Company, plaintiff below, sued the United States Shipping Board Emergency Fleet Corporation for the sum of $1,407.59, with interest, being the unpaid difference between the government rate and the commercial rate on messages transmitted by the telegraph company for the Fleet Corporation during the months of June and July, 1922. From a judgment in favor of the plaintiff, the defendant Shipping Board has appealed.

[1] The case turns upon the construction of section 5266, Rev. Stat. U. S. (Comp. St. § 10075), as follows: "Telegrams between the several departments of the government and their officers and agents, in their transmission over the lines of any telegraph company to which has been given the right of way, timber, or station lands from the public domain shall have priority over all other business, at such rates as the Postmaster General shall annually fix. And no part of any appropriation for the several departments of the government shall be paid to any company which neglects or refuses to transmit such telegrams in accordance with the provisions of this section."

There is no controversy as to the service having been rendered and paid for by the Shipping Board at the government rate. This suit is to recover the difference between the government rate and the commercial rate; hence the issue narrows itself to whether or not the Shipping Board is such an agency of a department of the government as will bring it within the provisions of the above statute. From an agreement entered into between the Shipping Board and the telegraph company, the present case seems to be a test one. It was stipulated, among other things, "that both parties will expedite to a final determination by the Supreme Court of the United States a proposed suit (the present suit) by the telegraph company, to be brought in the Supreme Court of the District of Columbia against the Fleet Corporation, claiming compensation at the commercial rate for transmitting certain messages from and to the Fleet Corporation, billed at Washington during the months of June and July, 1922."

It was also stipulated that, pending the present suit, the telegraph company should

render its bills showing the amount charged at the commercial rate and also the amount charged at the prevailing government rate; that the Fleet Corporation should promptly audit the bills, both at commercial and government rates, and when found correct pay the same at the government rate; that, pending the final determination of this suit, the payment of the bills at the government rate and the receipt thereof by the telegraph company shall be without prejudice to the claim of the telegraph company for the balances which would be due it at the commercial rate.

The Fleet Corporation was incorporated by the United States Shipping Board under the provisions of the Act of Congress of September 7, 1916, 39 Stat. 728 (Comp. St. § 8146a et seq.), with a capital stock of $50,-000,000, of which the board, on behalf of the United States, might subscribe to and vote not less than a majority of the stock. All of the stock was thus subscribed by the Shipping Board. The act further provided that "the board, with the approval of the President, may sell any or all of the stock of the United States in such corporation, but at no time shall it be a minority stockholder therein." Section 11 (Comp. St. § 8146f).

The object of the corporation, as stated in its certificate, is "the purchase, construction, equipment, lease, charter, maintenance, and operation of merchant vessels in the commerce of the United States, and in general to do and to perform every lawful act and thing necessary or expedient to be done or performed for the efficient and profitable conducting of said business as authorized by the laws of Congress, and to have and to exercise all the powers conferred by the laws of the District of Columbia upon corporations under said subchapter four (4), of the incorporation laws of the District of Columbia."

Following the declaration of war, Congress passed the Act of June 15, 1917, 40 Stat. 182, granting the President sweeping control over the expenditure of the "emergency shipping fund." Among other things, the act provided: "That all money turned over to the United States Shipping Board Emergency Fleet Corporation may be expended as other moneys of said corporation are now expended. All ships constructed, purchased, or requisitioned under authority herein, or heretofore or hereafter acquired by the United States, shall be managed, operated, and disposed of as the President may direct." Section 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115¼d).

The fact that, following the passage of this act, the Fleet Corporation was used by the President to assist him in carrying out certain of the war powers imposed upon him by Congress, in no way changed it from the status of a private corporation, or relieved it from its obligations as such. In United States v. Strang, 254 U. S. 491, 41 S. Ct. 165, 65 L. Ed. 368, the court, answering the contention that the Fleet Corporation is a mere agency or instrumentality of the United States for executing certain limited governmental powers delegated to it by the President, and therefore not liable to suit, said: "The corporation was controlled and managed by its own officers, and appointed its own servants and agents, who became directly responsible to it. Notwithstanding all its stock was owned by the United States, it must be regarded as a separate entity. Its inspectors were not appointed by the President, nor by any officer designated by Congress; they were subject to removal by the corporation only and could contract only for it. In such circumstances we think they were not agents of the United States."

The liability of the Fleet Corporation to suit on contracts made through its agents and representatives has been upheld in many cases, notwithstanding the ownership of its stock by the government and its peculiar relation to the government, growing out of the war emergency, where it was used by authority of Congress as an agency of the President. Krichman v. United States, 256 U. S. 363, 41 S. Ct. 514, 65 L. Ed. 992; Sloan Ship Yards Corporation v. United States Shipping Board Emergency Fleet Corporation, 258 U. S. 549, 42 S. Ct. 386, 66 L. Ed. 762; Astoria Marine Iron Works v. Fleet Corporation, 258 U. S. 549, 42 S. Ct. 386, 66 L. Ed. 762; Eichberg v. Fleet Corporation, 51 App. D. C. 44, 273 F. 886.

In Commercial Pacific Cable Co. v. Philippine National Bank (D. C.) 263 F. 218, the court had under consideration the liability of the Philippine National Bank to pay commercial rates on telegrams sent by the bank and its officers and agents, through the Bureau of Insular Affairs of the United States government as an intermediary, at government rates, with the statutory precedent as to transmission. Under the statute providing for the creation of the bank, the Philippine government was required to at all times own at least 51 per cent. of the stock of the bank. At the time the suit was brought, it owned 85 per cent. of outstanding stock. The voting power of the stock was fixed in a committee, consisting of the Governor Gen-

eral, who is appointed by the President of the United States, the President of the Philippine Senate, and the Speaker of the Philippine House. The affairs of the bank are managed by the board of trustees, consisting of a president, vice president, and five elective members. The president and vice president are appointed by the Governor General, with the advice and consent of the Philippine Senate. The remaining five directors are elected in accordance with the general corporation law. The Attorney General of the Philippines is attorney for the bank, and the auditor, appointed by the President, is ex officio auditor of the bank. Power is lodged in the Governor General, with the consent of the Senate, to remove certain officers of the bank. Indeed, the bank was organized as a government agency, to build up and advance the wealth of the Islands.

Judge Mayer, in his decision, reached the following conclusion: "In view of the foregoing and other provisions, it is argued that the interest of the United States is so inextricably mingled with the purposes and administration of the bank and the welfare of the Islands and their government that the bank in effect is a department or agent of the government of the United States. But, although in the complex problems attendant upon the administration of the Philippine government, in the interest of its welfare and that of the United States, the bank has, of course, many close relations with the United States government, nevertheless there may be private ownership to the extent of 49 per cent. of the stock of the bank, and it is permitted to do and does do a commercial business for profit, like any other bank. A financial institution so constituted cannot be a 'department' of the United States government, or an 'agent,' in the sense of section 5266 of the Post Road Act, supra."

This case is closely analogous to the one at bar. There, as here, the corporation was acting in many respects as an agency of a department of the government of the United States, but it was treated as a private corporation, and therefore not such a departmental agency as could avail itself of the provisions of the statute granting government rates on telegrams. The underlying principle in the present case, as in the cases above cited, holding the Shipping Board liable to suit as a private corporation, was announced by Chief Justice Marshall in Bank of the United States v. Planters' Bank of Georgia, 9 Wheat. 904, 6 L. Ed. 244, as follows: "It is, we think, a sound principle that, when a government becomes a partner in any trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates itself, and takes the character which belongs to its associates, and to the business which is to be transacted. Thus, many states of this Union, who have an interest in banks, are not suable even in their own courts; yet they never exempt the corporation from being sued. The state of Georgia, by giving to the bank the capacity to sue and be sued, voluntarily strips itself of its sovereign character, so far as respects the transactions of the bank, and waives all the privileges of that character. As a member of a corporation, a government never exercises its sovereignty. It acts merely as a corporator, and exercises no other power in the management of the affairs of the corporation, than are expressly given by the incorporating act."

[2] It has been a settled principle of law in this country that where a state or the general government descends from the plane of sovereignty and associates itself in a corporate capacity with private persons, it becomes in the eyes of the law a private person itself and is bound accordingly. Hall v. Wisconsin, 103 U. S. 5, 26 L. Ed. 302; South Carolina v. United States, 199 U. S. 437, 26 S. Ct. 110, 50 L. Ed. 261, 4 Ann. Cas. 737. In other words the mere fact that the United States owns stock in a corporation, does not vest the corporation with rights belonging to the government in its sovereign capacity.

The Fleet Corporation is a distinct corporate entity through which the President acted in carrying out the war powers authorized by the Act of June 15, 1917, authorizing the President, among other things, "to modify, suspend, cancel, or requisition any existing or future contract for the building, production, or purchase of ships or material." It also made provision for compensation in the event a contract was canceled by the President or through any agency of the government selected by the President for that purpose. It has been held, in the cases adjudging the Fleet Corporation to possess the functions of a mere private corporation, that the authority conferred upon the President to cancel contracts or authorize the cancellation through the Fleet Corporation in no way affects the liability of the corporation to suit on its contracts in the courts.

While the service obtained from the telegraph company may in part have been employed in relation to government business, it was the separate contractual obligation of the corporation, totally independent of any direct authority derived from the President. It logically follows that no contract is here involved with which the President, in carrying out the provisions of the act of 1917, was in any way concerned. The service was performed for the corporation, and the mere fact that some of it may have been rendered in connection with government business in no way affected the corporate status of the Fleet Corporation or converted it into either a department of the government of the United States or an agent or officer of a department, within the purview of section 5266, Rev. Stat., supra.

The judgment is affirmed, with costs.