**UNITED STATES v. SKINNER & EDDY CORPORATION.**

District Court, W. D. Washington, N. D. July, 1928.

No. 9124.

See, also, 5 F.(2d) 708.

Oliver P. M. Brown, Sp. Asst. Atty. Gen., Clarence L. Reames, Special Counsel, and Ben L. Moore, Special Counsel, both of Seattle, Wash., for the United States.

Louis Titus, of Washington, D. C., and George Donworth, L. B. Stedman, C. H. Winders, and Wm. Edris, all of Seattle, Wash., for defendant.

NETERER, District Judge (after stating the facts as above). The defendant moved the court that the report signed as auditor be considered and treated as if signed as master in chancery, the two reports to be considered by the court as signed in both capacities of special master and auditor; and, second, that the evidence reported and filed with the report be considered by the court in the same way as any evidence taken and reported by a master in chancery is usually considered by the court. The court at the time denied the first part of the motion, and as to the second part said the report will be admitted and received and treated as prima facie evidence of the findings and conclusions, subject to the exceptions that had been filed, and, if necessary to pass upon the exceptions, the court will consider the testimony taken before the auditor and master and returned to the court, and, if during the consideration of this case the court concludes that right cannot be administered, except on the equity side of the court, the case will be transferred to equity for final disposition. After hearing the testimony and the argument, I feel that the case cannot be rightly disposed of without the application of equitable principles, and it will be transferred to equity.

### Right to Sue.

The defendant at the outset challenged the right of the plaintiff to maintain this action. The challenge was denied. United States v. Skinner & Eddy Corporation (D. C.) 5 F.(2d) 708. The question is again seriously raised. This court in United States v. Clallam County, 283 F. 645, where the county sought to tax railroad property held by the United States Spruce Production Corporation, organized under the laws of the state of Washington, under powers conferred by Congress to expedite the production of airplanes for war purposes, all the stock being owned by the United States, held that the issue presented had no relation to rule of conduct and responsibility therefor, and that it was not sought to subject the Spruce Production Corporation for responsibility for overt or omitted acts, but involved ownership by the United States of property reserved for public use. This was certified to the Supreme Court of the United States on appeal to the Circuit Court of Appeals, and this court was affirmed. Clallam Co. v. U. S., 263 U. S. 341, 44 S. Ct. 121, 68 L. Ed. 328.

The issue here does not involve tortious conduct of the corporate officers of the instrumentality, but relates to property reserved and owned by the United States. The contracts entered into between the Fleet Corporation and the defendant disclosed the principal for whom the Fleet Corporation was acting. See, also, Act June 15, 1917, 40 Stat. 182. The Fleet Corporation was merely "an instrumentality of the Government." United States ex rel. Skinner-Eddy v. McCarl, 275 U. S. 1, 48 S. Ct. 12, 72 L. Ed. ——. Right was reserved in the contracts for the cancellation of the contracts by the United States. The contracts were canceled by direction of the President. The United States is the party benefited or injured by the judgment or decree (Stinchcomb v. Patteson, 66 Okl. 80, 67 P. 619), the real party in interest, and as such is the proper party to prosecute this action. West & Wheeler v. Longtin, 118 Wash. 575, 204 P. 183. The plaintiff clearly has the right to control this action and receive the fruits of the litigation. Gross v. Heckert, 120 Wis. 314, 97 N. W. 954. See, also, Taylor v. Hurst, 186 Ky. 71, 216 S. W. 95; Greene v. McAuley, 70 Kan. 601, 79 P. 133, 68 L. R. A. 308. When payment is made to the plaintiff it is full protection to defendant on further liability. Los Robles v. Stoneman, 146 Cal. 203, 79 P. 880.[1]

The principal may sue on the contract of his agent. Stinson v. Sachs, 8 Wash. 391, 36 P. 287; First Nat'l Assur. Soc. v. Farquhar, 75 Wash. 667, 135 P. 619; Albany, etc., Iron Co. v. Lundberg, 121 U. S. 451, 7 S. Ct. 958, 30 L. Ed. 982. The contract of the agent is the contract of the principal, and the prin-

---

[1] See, also, Philbrook v. Superior Court, 111 Cal. 31, 43 P. 402; Blaser v. Fleck, 96 Or. 187, 189 P. 637; Black v. Donelson, 79 Okl. 299, 193 P. 427; Ill. Cent. R. Co. v. Hicklin, 131 Ky. 624, 115 S. W. 752, 23 L. R. A. (N. S) 870; Sturgis v. Baker, 43 Or. 236, 72 P. 744.

cipal may sue thereon.[2] The defendant is not deprived of establishing any credit on striking a balance on just demands. United States v. Eckford, 73 U. S. (6 Wall.) 484, 18 L. Ed. 920; Schaumburg v. United States, 103 U. S. 667, 26 L. Ed. 599.

### Lease or Contract of Sale.

During the early part of 1918 the Seattle Construction & Dry Dock Company was the owner of a shipyard in the city of Seattle immediately adjacent to the defendant's yard, and was constructing 10 ships for the Fleet Corporation, 4 of them being on the ways. The Fleet Corporation was dissatisfied with the work being done, and opened negotiations with the owners of the yard and with the defendant. The Director General, executive head of the Fleet Corporation, said of the defendant: "They were very reluctant to undertake the additional responsibility, but finally, through persuasion and an offer of additional contract of ships, induced them to take over the added responsibility," and the Fleet Corporation purchased the yard from the Seattle Construction and Dry Dock Company on the 10th day of May, and on the following day closed with the defendant to take it over. This proposal suggested a lease to the defendant upon a rental of $125,000 per ship for the first 30 ships, "and at the time of the completion of the thirtieth ship we will sell to you and you will buy all of the property," the rent paid to apply on the purchase price of the yard. The defendant accepted it. The proposal (Exhibit S) also recited: "The Fleet Corporation, representing the United States, agrees to award to petitioner a contract for 15 ships and additional contract for 35 ships, and also agrees to sell to petitioner the plant, equipment, and machinery, purchased by the United States," at the *cost of the yard* to the Fleet Corporation, and that the defendant should finish the 4 hulls on the ways and receive therefor a proportion of the contract price which the Seattle Construction & Dry Dock Company had agreed to accept, and required the defendant to purchase five-twelfths of all of the old stock and material at cost price, and not do any work on private account, and maintain a complete shipbuilding plant adequate for ship construction, and be ousted of possession of the entire enterprise if the work was not proceeding to the satisfaction of the Fleet Corporation.

[2] U. S. v. Buford, 3 Pet. (28 U. S.) 12, 7 L. Ed. 585; Stone v. U. S., 167 U. S. 178, 17 S. Ct. 778, 42 L. Ed. 127; U. S. v. Brown, 247 N. Y. 211, 160 N. E. 13.

The defendant went into possession of the yard and immediately commenced its reconstruction. Mr. Piez, the Director General and executive head of the Fleet Corporation, testifying, said he knew, at the time that the contract with Skinner-Eddy was made, that they would have to expend a large sum of money in rebuilding the yard—knew that the yard was ineffective, badly arranged, and that the purpose of the change and arrangement with the defendant was to insure *greater speed.*

The plaintiff contends: That the relation between the defendant and the plaintiff was that of lessor and lessee. That by the terms of the lease the full sum of $3,750,000 as rental accrued, while the defendant contends that the proposal, the acceptance, the lease and the contract for ships must be considered together. That the lease was based on three things: (a) The contract for the ships; (b) the use of the yard; and (c) fee-simple title to the yard, clear of incumbrance. That the contract for the ships being canceled, the defendant ousted from the possession over its protest, and the property sold to another, the consideration for the lease failed, and that the defendant be only chargeable for the reasonable rental.

After the acceptance of the proposal of May 11, conversations continued with relation to the transfer and after the execution of the lease, on August 23, the Fleet Corporation asked the defendant if it desired a more formal contract covering the purchase of the yard, and the defendant on August 30 stated that it did as soon as the exact purchase *price* of the yard was ascertained. Both parties, thereafter, on conference, considered Exhibit S complete as a contract of sale and had no intention of abandoning any of its provisions.

Where the meaning of an agreement is obscure or doubtful, or susceptible of two constructions, the probable, rational, and equitable construction must be employed in preference to an unfair and improbable contract. Pressed Steel Car Co. v. Eastern Ry. Co. (C. C. A.) 121 F. 609; American Bonding Co. v. Pueblo Co. (C. C. A.) 150 F. 17, 9 L. R. A. (N. S.) 557; A. Leschen v. Mayflower (C. C. A.) 173 F. 855, 35 L. R. A. (N. S.) 1; Barnsdall Oil Co. v. Leahy (C. C. A.) 195 F. 731; W. J. Foye Lumber Co. v. Penn. Ry. Co. (C. C. A.) 10 F.(2d) 437; Id., 271 U. S. 681, 46 S. Ct. 632, 70 L. Ed. 1149. From the disclosures it must be concluded that the probable, equitable, and rational conclusion as to the memoranda of May 11, and contract for ships and lease re-

lating to the same subject-matter, must be construed together as one contract. Barrett Co. v. United States, 273 U. S. 227, at page 234, 47 S. Ct. 409, 71 L. Ed. 621. The payments made, while called "rental," were in fact payments to be applied on the purchase price, and $3,750,000 was to be paid as and when 30 vessels were delivered; when the contracts were canceled, the defendant had no use for the yard and was deprived of the ability to pay, the method and time for which was provided in the contract and in the lease, the intent of the parties, no doubt, being that, while the sale was complete, the title should not be divested until the purchase price was fully paid.[3]

The contract for the ships was canceled (Act June 15, 1917), the defendant ousted from the property over its protest, and the property sold by the Fleet Corporation to another. The charge against the defendant for occupying the yard must therefore be predicated upon a reasonable rental, which is stipulated as $1,597,126.52, upon which the defendant has paid $514,441.40, leaving a balance of $1,082,685.12.

### Taxes Paid.

■ The reasonable rental covering the entire property precludes the right of recovery of taxes in the sum of $6,997 paid by the Fleet Corporation.

### Value of Performance.

■ There was no evidence of the value of performance before the auditor and master, and no allowance of just compensation on that account was made. There is evidence before this court, by men whose competency is shown, that the value of the performance ranges from 5 to 10 per cent. to cover items of activity, interest, and engagement in carrying forward performance of the contracts. The executive head of the Fleet Corporation testified before the master and auditor that the preliminary payment of 5 per cent. at the execution of the contract, and 5 per cent. on November 1st following, were made because the defendant had great expense to in-

cur. There were contractual obligations to be assumed, and relations on the part of the defendant sustained, which were taken into consideration by the parties. The executive head, Mr. Piez, said: "We recognized the fact that you had a very considerable amount of additional expense in preparing the Todd plant for the efficient and speedy construction of ships."

Money was expended on a plant not owned by the defendant, and in which defendant had no immediate interest, except under the memoranda of sale and lease. The materials, aggregating $18,750,000, had been purchased in the United States and foreign countries for all of the ships; all of the preliminary arrangements were in order, and a number of deliveries had been made under contract No. 324, and defendant was prepared to carry out contract No. 447 when the time came; and upon the cancellation of the contracts it was deprived of an intangible value earned, of just compensation for performance, and of the perfect equivalent for the interest in the contract and the work actually performed, and was left in a pecuniarily worse position and suffered a loss for which it was not compensated. The performance, the witnesses say, is not measurable in dollars and cents. It is intangible, but nevertheless present; and from the established facts, it is apparent that there is an intangible, immeasurable, "out of pocket" loss. And for this necessarily incurred expense no allowance was made by the auditor and master, for want of proof.

While the testimony shows that not less than 5 per cent. was a reasonable allowance for this intangible, immeasurable performance, I think, under all of the circumstances, an allowance of three-fourths of 1 per cent. would not be an unreasonable allowance on the canceled ships. On the ships constructed no loss was suffered. This would amount to $13,687.50 on each ship, and on the 13 ships canceled under contract No. 324, amounts to $177,937.50. The first ship under contract No. 447 was to be delivered August 31, 1919. While there is likewise an intangible, immeasurable loss that the defendant sustained with relation to contract No. 447, no fixed allowance will be made. This contract had not been entered upon, and not so many elements would enter into this contract as No. 324.

It may also be said that the latter part of the contract for the building of the ships in yard No. 2 was of greater value because, in the beginning, the ships were necessarily constructed under a handicap, since the

---

[3] Hervey v. R. R. Locomotive Works, 93 U. S. 664, 23 L. Ed. 1003; Murch v. Wright, 46 Ill. 487, 95 Am. Dec. 455; Central Union Gas Co. v. Browning, 210 N. Y. 10, 103 N. E. 822; Wood v. Cox, 92 N. J. Eq. 307, 113 A. 501; Gerrish v. Clark, 64 N. H. 492, 13 A. 870; Gross v. Jordan, 83 Me. 380, 22 A. 250; Miller v. Steen, 30 Cal. 402, 89 Am. Dec. 124; Parke & Lacy v. White River Co., 101 Cal. 37, 35 P. 442; Lytle v. Scottish Am. Mort. Co., 122 Ga. 458, 50 S. E. 402; City and County of San Francisco v. Boyle, 195 Cal. 426, 233 P. 965; Mahoney v. City and County of San Francisco, 201 Cal. 248, 257 P. 49.

plant was being rearranged, buildings torn down, and new machinery installed. These changes were required by the Fleet Corporation when the advance payment was stipulated. The opportunity to benefit by the bonus provisions of the contract was jeopardized, and which privilege was not hampered after the improvements in the yard were completed. The finished ships were launched and new ones placed on the ways, so that the division and allowance made by the Shipping Board, adopted by the auditor, did not give to the defendant the value and perfect equivalent for the interest in the contract and in the work actually performed (Monongahela Nav. Co. v. United States, 148 U. S. 312, 13 S. Ct. 622, 37 L. Ed. 463), did not leave the defendant in as good a position pecuniarily as it would have been, had the contract not been canceled (United States v. New River Collieries, 262 U. S. 341, 43 S. Ct. 565, 67 L. Ed. 1014), and did not give the amount to the defendant lost by the cancellations (United States v. Brooks-Scanlon Corporation, 265 U. S. 106, 44 S. Ct. 471, 68 L. Ed. 934; United States v. Chandler-Dunbar, 229 U. S. 53, 33 S. Ct. 667, 57 L. Ed. 1063). There is no doubt an indefinite, "out-of-pocket" expense which has not been met.

### Materials Not Lifted.

Upon cancellation of the contracts, the defendant had on hand a large quantity of steel and stores specially ordered for the 25 canceled vessels, and steel and stores not specially ordered for the canceled vessels, but suitable for use therein, and not in excess of requirements. The Fleet Corporation lifted all steel and stores ordered—"earmarked"— for the ships. The amount not lifted, claimed in the answer, $2,079,352.35, was reduced on hearing before the auditor and master, by the defendant, to $1,688,707.90. The auditor found this amount should be allowed the defendant as an item of just compensation.

The plaintiff contends that the proof is insufficient, and also in its reply pleads accord and satisfaction of the unlifted material and stores. The auditor and master found from the evidence the facts to be with the defendant. This finding, from an examination of the record and trial before the court, will be adopted. The auditor and master had before him the witnesses and personal touch of all that an open trial affords. He is a man of ripe and fruitful experience, and had the active assistance by suggestion and argument of exceptionally well qualified, eminent, capable, efficient, learned, and painstaking lawyers who had the case exceptionally well prepared, for the plaintiff and the defendant, and the solemnity under which the evidence was received and trial conducted, with the privilege of examination which was exercised by all parties, and time for deliberate consideration, afforded exceptional opportunity for finding the truth. The evidence before the court on this trial did not overcome the prima facie case made before the auditor and master that the material and stores were suitable for use in the canceled ships and not in excess of requirements. There is some evidence by the plaintiff seeking to cast doubt as to some of the stores, but it is not sufficient; but, for good measure, the court will approve the allowance for just compensation on the amortization of plant No. 2, and not allow any further compensation by reason of the inequality of the just compensation accorded on the basis of $\frac{22}{35}$ and $\frac{13}{35}$ and the intangible loss for performance on contract No. 447, for the reason before stated.

### Accord and Satisfaction.

The master and auditor found that a compromise agreement was made by the correspondence in the record, but said the difference between $2,079,352.35 and $441,283.94, quoting Lord Thurlow, in Gwyn v. Heaton, 1 Bro. Ch. 1, 9, was "so much an inequality, so strong, gross, and manifest, that it must be impossible to state it to a man of common sense without producing an exclamation at the inequality of it," and also quoted from Myers v. Hurley Motor Co., 273 U. S. 24, 47 S. Ct. 278, 71 L. Ed. 515, 50 A. L. R. 1181: "The defendant may rely upon any defense which shows that the plaintiff in equity and good conscience is not entitled to recover in whole or in part," and cited other cases.

I agree with the conclusion of the auditor and master that the accord and satisfaction should not be enforced, but I have substantial doubt that it has been shown to have been entered into within the intent and purview of the law and issue, approaching it from all viewpoints. Can. L. B. Co. v. Butterworth, 12 Dom. Law Rep. 143; Lovekin v. Fairbanks, Morse Co., 282 Pa. 100, 127 A. 450. Within the intent and purview of the issue, it is *not clearly shown* from the evidence that the minds met,[4] and the burden is upon the

---

[4] Held v. Keeler, 135 Minn. 192, 160 N. W. 487; Kissel v. Myer & Bush Co., 96 N. J. Law, 513, 115 A. 378; St. L. Ry. Co. v. U. S., 268 U. S. 169, 45 S. Ct. 472, 69 L. Ed. 899; U. S. v. Justice, 81 U. S. (14 Wall.) 535, 20 L. Ed. 753; Lee v. Tarplin, 183 Mass. 52, 66 N. E. 431; Beattie v. N. Y. Constr. Co., 196 N. Y. 346, 89 N. E. 831; Cable Co. v. Shelby, 203

plaintiff (Wolf v. Humboldt, 36 Nev. 26, 131 P. 964, 45 L. R. A. [N. S.] 762), and this has not been sustained. The exception of the defendant to this conclusion is therefore sustained.

*"The title to all of the material"* paid for by the defendant, or obligated to payment, was in the Fleet Corporation by the express terms of the contract. Upon the cancellation, the right of the Fleet Corporation to this title ceased, and the keeping was without right or claim of right; the *"furtherance of the contract" was ended* by cancellation. The Fleet Corporation was legally bound to restore title, and, by so doing, it did what it was legally bound to do, and the permission of the defendant to allow the Fleet Corporation to retain a part of the steel, and accept the remaining part on the Fleet Corporation's terms, does not bar the defendant to claim for the wrong suffered. Manley v. Insurance Co., 78 Vt. 331, 62 A. 1020, 6 Ann. Cas. 562; Noyes v. Pierce, 97 Vt. 188, 122 A. 896, at page 898. There was no benefit of right accruing to the defendant or damage to the Fleet Corporation to support accord and satisfaction. Brooks v. White, 2 Metc. (Mass.) 283. The Fleet Corporation parted with nothing that belonged to it, lost nothing (Struck Co. v. Slicer, 23 Ga. App. 52, 97 S. E. 455; Borden & Co. v. Vinegar Co., 7 Ala. App. 335, 62 So. 245; La Moure v. Cuyuna-Mille Lacs Iron Co., 147 Minn. 433, 180 N. W. 540), and the defendant gained nothing. The delivery of the defendant's material to the defendant was not a consideration to support the cancellation, or waiver of claim. Smith v. Bartholomew, 1 Metc. (Mass.) 276, 35 Am. Dec. 365; Evans v. Evans (Mo. Sup.) 52 S. W. 12; Manley v. Insurance Co., supra; Noyes v. Pierce, supra.

The correspondence resulted in nothing but an adjustment of possession of materials, etc., to which the Fleet Corporation had no claim of right after cancellation. And the taking and selling of the unlifted material does not bar claim for loss due to cancellation (Mitchell v. U. S., 267 U. S. 341, 45 S. Ct. 293, 69 L. Ed. 644), without clear and unmistakable understanding, and waiver of claim must be strictly construed (Walton Lumber Co. v. State Bank, 140 Wash. 133, 248 P. 82). The "cancellation claim" was expressly not affected, and at the time the officers of the Fleet Corporation were not vested with any power of adjustment of just compensation. Act June 5, 1920 (41 Stat.

Ala. 28, 81 So. 818; Ingram v. Sauset, 121 Wash. 444, 209 P. 699, 34 A. L. R. 1031; Dimmick v. Banning Co., 256 Pa. 295, 100 A. 871.

988), gave the *Shipping Board power* to determine just compensation. There was no *claim* of accord and satisfaction until the filing of the reply, nearly 6 years after the settlement contended for, and while the division of unlifted materials is confirmed in the letter, and the unlifted material was sold by the defendant, yet the alleged compromise is out of harmony with prior and subsequent conduct of the parties, and a release of right, by taking part of the material, when all belonged to the defendant, the plaintiff being bound to compensate defendant for the right lost in the transaction is void; it is *nude.* Fire Ins. Co. v. Wickham, 141 U. S. 564, 12 S. Ct. 84, 35 L. Ed. 860. There was no independent consideration. Van de Ven v. Overlook, 146 Wash. 332, 262 P. 981; Thompson v. Moe (Wash.) 265 P. 457; Piatt's Adm'r v. United States, 89 U. S. (22 Wall.) 496, 22 L. Ed. 858; Eichler v. Werner (Wash.) 266 P. 171.

The plaintiff, after the alleged accord and satisfaction, entered into an examination of the matter of just compensation. The defendant filed a claim, in which was included the claim in issue, $2,079,352.35, with the Shipping Board, and the board allowed for unlifted materials, $280,313.78, in 1923. This would obviously not have been done, if the matter of unlifted material had been settled. The special counsel for the government in this case, the record shows, were not advised of the so-called accord and satisfaction until after the answer of the defendant was filed and the reply to the answer was made. A matter of so great consequence, considered no doubt by eminent counsel who preceded present counsel, and who knew all of the circumstances when they were new and fresh, would not have been permitted to lie dormant, in view of the constant assertions and claims made by the defense, if the minds of the parties had met upon the matter of settlement as to the unlifted material.

Inventory was taken jointly by the defendant and plaintiff of the materials lifted and unlifted, but the adjuster would take only "earmarked material." The market was falling, and what was done at the moment does not show that the damage, or just compensation—"cancellation claim"—to defendant by reason of such unlifted material, was influenced in any way. The defendant had to take over the unlifted material to divest the Fleet Corporation of title, so as to be able to satisfy purchasers as to title on sales. The legal right, or procedure, on adjusting compensation, had not been settled. There was uncertainty in the mind of the Fleet Cor-

poration officers and the representatives of the defendant, but one fact was present—a falling market and payment, or obligation to pay for the material. The defendant, upon urgency of the Fleet Corporation for greater speed for delivery of ships, had obligated itself for $18,750,000 worth of steel and stores. On cancellation nearly $3,000,000 worth was on hand. This had to be paid for, or, if paid out of advance payments on contracts for ships, it had to be returned. The "negotiator" fixed the terms; the defendant was helpless: "If that is your attitude we will have to take it." The attitude of the "negotiator" and representative of the Fleet Corporation is *strongly suggestive of duress*. See Freund v. United States, 260 U. S. 60, 43 S. Ct. 70, 67 L. Ed. 131.

Chief Justice Fuller, in Hume, v. United States, 132 U. S. 406, at page 414, 10 S. Ct. 134, 137 (33 L. Ed. 393), said: "And there may be contracts so * * * unconscionable on their face as to raise the presumption of fraud in their inception, or at least to require but slight additional evidence to justify such presumption." There was no agreement or acquiescence or conduct leading defendant to believe that approximately $400,000 should pay for more than $2,000,000 loss, then claimed. See St. L. Ry. Co. v. United States, 268 U. S. 169, 45 S. Ct. 472, 69 L. Ed. 899.

Inventories of sales were furnished to the plaintiff, which were examined with great particularity. The defendant filed claims for just compensation. These were repeated and finally culminated in an action to compel an audit. In this action the claim for unlifted material was not included by that name, and this was denied by the Supreme Court (United States ex rel. Skinner-Eddy Corporation v. McCarl, supra), and while the record shows that the claims filed were increased from time to time, contended by the plaintiff as evidence of "padding," or unjust claims, yet the proofs before the auditor and master and this court show the amount of loss was always demanded, but asserted in a different way. Inventories of all materials and the books of the defendant were in the possession of the plaintiff for long periods of time; access was free and open, and upon the trial before the court it is shown that not much, if any, of the material was unsuitable for ship construction. A list is presented, however, of stores, which, it is claimed, were not necessary; yet, from all of the disclosures, I am convinced that while there may have been some items of stores, that is not sufficient when the value is not shown, to throw aside the entire claim. The court upon the trial suggested that these values should be shown, so as to enable the court to conclude as to the right; but notwithstanding the request or the long period of time that the experts had the possession of the inventories and records, that there is no evidence upon which the court can predicate a conclusion that the claim should be disallowed.

■ Upon the record, it is obvious, as found by the auditor and master, the defendant, by such compromise, would be greatly wronged. Blackstone has said: "There is no wrong without a remedy." Law or equity must remedy a wrong unfolded before it. Wrong, in truth, sometimes appears in the habiliments of right. The law blossoms upon the soil of wrong; but, if the law is barren, the virtue of equity must unfold into the fruitage of right. This asserted wrong may be within the garb of right, "so stated in the bond," but it does not disclose the true intent, and equity must unfold and fix the true status, and place the agreement within the intent and spirit of the parties. See Church of Holy Trinity v United States, 143 U. S. 457, 12 S. Ct. 511, 36 L. Ed. 226; The Llewellyn J. Morse, Lasky Famous Players (D. C.) 25 F.(2d) 973. The court should look beyond the strict letter of the correspondence to the intent, in view of the unconscionable result.

■ The reply seeks enforcement of the agreement, and plaintiff must come with "clean hands and with an apparently clear conscience" (Dunscombe v. Amfot Oil Co., 201 Ky. 290, 256 S. W. 427); and to prevail it must be clearly shown that the contention is free from mistake, or illegality, perfectly fair, equal and just, not only in its terms, but in its circumstances (Nevada Nickel Syndicate v. National Nickel Co. [C. C.] 96 F. 135, at page 145); and where it is "unconscientious or unreasonable" (Cathcart v. Robinson, 5 Pet. [30 U. S.] 264, 8 L. Ed. 120), or the disproportion is so great as to shock the conscience (Marks v. Gates [C. C. A.] 154 F. 481, 14 L. R. A. [N. S.] 317, 12 Ann. Cas. 120; Id., 2 Alaska, 519), or, where the disparity is gross, equity will not enforce relief (Pasco F. L. Co. v. Timmermann, 88 Wash. 112, 152 P. 675). All of the disclosed circumstances show that the accord and satisfaction, as said by the Supreme Court in Piatt's Adm'r v. United States, 22 Wall. (89 U. S.) 496, 22 L. Ed. 858, " * * * is utterly destitute of merit and repugnant to the plainest dictates of both law and justice."

There is some evidence that some of this material was old and came from materials

from the battleship Nebraska, built by the Seattle Construction & Dry Dock Company some years ago; but, if so, it came from the yard given by the plaintiff to the defendant, in the taking of which the defendant was to pay cost price and receive a contract for the construction of the ships which were canceled, and for the material coming from the plaintiff under that arrangement, the agreed statement of facts allows to the plaintiff over $600,000 at the cost prices for the steel, etc., from the former yard, and it would be grossly inequitable to compel the defendant to pay cost price for this material, delivered under the circumstances, and receive a much lower price because of the cancellation of the ships and the market conditions.

The plaintiff seeks to show that the steel sold by the defendant was not sold for its fair market value, and the plaintiff not placed in statu quo. A number of witnesses were called, but the testimony is not convincing that the price obtained was not adequate. The testimony was directed to the spring of 1920; the steel and stores were sold in December, 1919. The price had been constantly falling from the time of the cancellation of the contracts until after the steel and stores were sold, but during the early part of the year 1920 there was a rise in the factory market. The witnesses did not disclose knowledge predicated upon facts that would qualify them to testify as to value of steel and stores at Seattle in the condition in which these materials were. The witnesses knew nothing of prices in Tacoma, Seattle, Portland, San Francisco, or Los Angeles, but all of the witnesses said that there was a great oversupply. One said: "There was a great deluge; there was a lot of it in the market." Mr. Scott, perhaps the star witness, came from Chicago, and was qualified as to prices of steel throughout the East and Middle West. His testimony was all predicated upon "Pittsburg" prices, with freight added, and he was unable to give the court any idea as to the value of such a stock of materials under the circumstances, other than the "Pittsburg" manufacturers' quotations. There is no satisfactory evidence before the court upon which to predicate an intelligent conclusion that the price obtained for this material was not the reasonable fair market value, and all that could be obtained under the circumstances then present.

Daily Bonus—$113,800—$745,600.

Plaintiff seeks to recover $113,800; being $300 per day daily bonus under contract No. 175 for advanced delivery before "the

herein provided dates," limited to a maximum premium of $25,000. Alterations were authorized under the provisions of the contract; time was extended 8 days, equal to the delay caused thereby; the hull was delivered 88 days prior to the extended date ($26,400), but only 80 days prior to the original date ($24,000). Claim was made for $25,000, the maximum provided in the contract; a voucher in due form was prepared and sent to the Fleet Corporation, was approved by the district manager and the local district auditor, and paid by the disbursing officer. The claim of the plaintiff, that the extension of 8 days given for the alteration did not extend the delivery date for bonus privileges, is not sustained. All the provisions of the contract must be construed together. The original delivery date was provisional. Crook Co. v. United States, 270 U. S. 4, 46 S. Ct. 184, 70 L. Ed. 438; Pressed Steel Car Co. v. Railway Co. (C. C. A.) 121 F. 609. "Dates herein fixed" and "dates above provided" mean the final date for conclusion of the contract.

Contracts No. 309 and No. 324 each provide for specific bonus of $50,000 a ship for advanced delivery. The plaintiff claims $72,800 overpayment under contract No. 309, and $40,000 under contract No. 324. The defendant takes issue, and claims $745,600 as additional per diem bonus under these contracts. The auditor and master denied plaintiff's demands and allowed defendant $33,600 additional per diem bonus under contract No. 324, and denied the balance of the claim.

Paragraph VIII of contracts Nos. 309 and 324 provides, in substance: Should the contractor succeed in delivering any of the vessels to the owner complete on or before the "dates above provided," the owner will pay as premium $50,000 for each completed vessel so delivered; and if the contractor is delayed in delivering any vessel "solely because of any act or default of the owner, * * * and the contractor could and would have delivered such vessel within the time provided, but for the owner's act or default, * * * if the contractor shall succeed in delivering such vessel within such extension of time as shall be allowed it because of the owner's act or default, the aforesaid bonus shall be payable to the contractor. * * *" Under another provision the owner has the right to make reasonable alterations and any delay by reason of such alterations shall extend the delivery for the period equivalent to the time required by reason thereof. There is a further provision for extension for delay caused by strikes, etc. The provisions are common to both of these contracts.

On July 18, following, a supplemental contract was made, for "valuable consideration, receipt of which is acknowledged and in consideration of mutual promises," changing the type of construction of vessels in contract Nos. 309 and 324, and has this provision: "In addition to the fifty thousand dollars ($50,000) bonus * * * the owner will pay an additional bonus to the contractor of eight hundred dollars ($800) per day per vessel for each and every day said vessel is delivered prior to the respective delivery dates specified in said contracts. In all other respects, the clause providing for bonus and liquidated damages in contracts No. 309 S. C. and No. 324 S. C. shall remain in force."

The defendant's contention that this quoted language has no application to the daily bonus claim, but that the daily bonus comes within the provisions of article 3 with relation to strikes, is not well taken, as the provision for daily bonus is clearly limited to the *delay caused by the owner*. The daily bonus provision being limited by the provisions of article VIII and the *strike not being an act or default of the owner*, no recovery can be had. This provision is not in contract No. 175. The defendant contends, however, that it earned daily bonuses under contract No. 309, independent of the strike; but it appears that, on the daily bonus earnings within the terms of contract No. 309, overpayment was made in the sum of $17,600 upon the theory that the daily bonus provision came within the "delay" provision of the contract. The auditor and master found this $17,600 an overpayment, being a voluntary overpayment based on a misinterpretation of the contract, and also found that under contract No. 324 the defendant earned daily bonuses, independent of the strike limitation, of $80,000, upon which it has been paid $46,400, leaving a balance of $33,600 unpaid, and credit should be extended for this amount. The findings and conclusions of the auditor and master will be adopted, and a credit will be awarded to the defendant, on its $745,600 claim, of $33,600, and the balance of the claim denied, and plaintiff's claim for $113,800 is denied.

### Voluntary Payments.

■ The payments were voluntary under an erroneous interpretation of the daily bonus provision of the contracts, and may not be recovered by subsequent suit. Lincoln v. Kuskokwim, 118 Wash. 137, at page 141, 203 P. 62. It is primer law that money paid for work not done may be recovered. United States v. Barlow, 132 U. S. 271, 10

S. Ct. 77, 33 L. Ed. 346. It would be against conscience not to return it. In the case at bar *the work was done;* all the conditions of the contracts were performed; all the facts were known and true; the work was speeded up and advance delivery was made; the money was paid. Delivery could only be speeded by the defendant inspiring the workers by payment for increased results; the desire of the Fleet Corporation for greater speed was fully met. Whether the daily bonus provision was improvident is not for the court to determine. The Fleet Corporation was under great stress; the welfare of the peoples of the world was thought to be in jeopardy and all hope was centered in the United States; the burden to furnish vessels for transport service was with the Fleet Corporation and it met the test; the demand for vessels was very great; vessels were indispensable; the charter hire to the plaintiff was over $1,600 per day per vessel.

The Supreme Court in Elliott v. Swartwout, 35 U. S. (10 Pet.) 137, at page 155, 9 L. Ed. 373, said: "* * * It would be most mischievous and unjust, if he who has acquiesced in the right, by such voluntary payment, should be at liberty, at any time within the statute of limitations, to rip up the matter and recover back the money."

Chief Justice Fuller, for the court, in Badeau v. United States, 130 U. S. 439, at page 452, 9 S. Ct. 579, 583 (32 L. Ed. 997), said: "As between individuals, where money has been paid under a mistake of law, it cannot be recovered back."

In United States v. Barlow, 132 U. S. 271, 10 S. Ct. 77, 33 L. Ed. 346, payment was made upon supposition that a specific fact was true, of which the court says on page 282: "But which fact is untrue, and the money would not have been paid if it had been known to the payer that the fact was untrue."

■ In Wisconsin Central R. R. Co. v. United States, 164 U. S. 190, 17 S. Ct. 45, 41 L. Ed. 399, the Quartermaster General acted outside the scope of the official authority given by law. In the case at bar the Fleet Corporation was created for the express purpose of carrying forward shipbuilding, to give greater liberty in the transaction of business on a plane of a private corporation, and necessarily its officers had power to make effective their work within the scope of corporate creation (Md. Steel Co. v. United States, 235 U. S. 451, at page 460, 35 S. Ct. 190, 59 L. Ed. 312), and the plaintiff abandoned for the purpose its sovereignty, and through its instrumentality, entered the sphere of a private party (Cooke v. United

States, 91 U. S. 389, at page 398, 23 L. Ed. 237; Manf'g Co. v. United States [17 Wall.] 84 U. S. 592, 21 L. Ed. 715; Hollerbach v. United States, 233 U. S. 165, 34 S. Ct. 553, 58 L. Ed. 898; Reading, etc., Co. v. United States, 268 U. S. 186, 45 S. Ct. 469, 69 L. Ed. 907; United States v. National Exchange Bank, 270 U. S. 527, 46 S. Ct. 388, 70 L. Ed. 717).

The creation of the Fleet Corporation and endowment of officers with power was to give greater liberty in transaction of business, and on a plane with private citizens and corporations in the transaction of business. Sloan Shipyards Corp. v. United States, etc., 258 U. S. 549, 42 S. Ct. 386, 66 L. Ed. 762, and also dissenting opinion at page 571 (42 S. Ct. 389); Federal Sugar Refining Co. v. United States, etc. (D. C.) 268 F. 575, at page 587; Haines v. Lone Star Shipbuilding Co., 268 Pa. 92, 110 A. 788; Gould Coupler Co. v. United States, etc. (D. C.) 261 F. 716; England National Bank v. United States (C. C. A.) 282 F. 121; United States, etc., v. Western Union, 56 App. D. C. 337, 13 F.(2d) 308; Hall v. Wisconsin, 103 U. S. 5, 26 L. Ed. 302.

Presentation of Claim to Comptroller General.

Section 951, R. S. (28 USCA § 774), has no relevancy here. The Fleet Corporation was organized April 16, 1917, by the Shipping Board under the original Shipping Board Act of September 7, 1916 (46 USCA § 801 et seq.), under the laws of the District of Columbia, as a private corporation. The Fleet Corporation thus became an instrumentality of the government. United States v. Walter, 263 U. S. 15, 44 S. Ct. 10, 68 L. Ed. 137. It could sue and be sued in state or federal courts. United States ex rel. Skinner & Eddy Corp. v. McCarl, 275 U. S. 1, 48 S. Ct. 12, 72 L. Ed. —. Its employees were not subject to the provisions of section 41, Criminal Code (18 USCA § 93), as government agents. United States v. Strang, 254 U. S. 491, 41 S. Ct. 165, 65 L. Ed. 368. Being a private corporation, the Fleet Corporation has not the attributes of sovereignty. The Merchant Marine Act of June 5, 1920, preserved all the rights and remedies of the Fleet Corporation, and provided for their enforcement, except that the Shipping Board should adjust and settle all matters relating to the determination and payment of just compensation. The claim in issue was presented to the Shipping Board.

When the government leaves its sovereignty and enters the sphere of commercialism, through its private corporate instrumentalities, it places itself within the rules of private parties. Cooke v. United States, 91 U. S. 389, at page 398, 23 L. Ed. 237; Manf'g Co. v. United States, 17 Wall. 592, 21 L. Ed. 715; Reading, etc., Co. v. United States, 268 U. S. 186, 45 S. Ct. 469, 69 L. Ed. 907; Hollerbach v. United States, 233 U. S. 165, 34 S. Ct. 553, 58 L. Ed. 898; United States v. National Exchange Bank, 270 U. S. 527, 46 S. Ct. 388, 70 L. Ed. 717.

Every purpose of section 951 has been served. The plaintiff not only had notice of this claim, but through the Shipping Board has been making investigation with relation to it. While the court could not enter judgment against the plaintiff for ascertained excess, if any, it may judicially ascertain on striking a balance the amount due on claim for compensation. The right of set-off is a substantial right (The Gloria [D. C.] 286 F. 188), and may not be restricted when suit is brought by the United States (Rosenberg v. Fleet Corporation [D. C.] 295 F. 372), and may be used in suit against defendant to extinguish debt to plaintiff (United States v. Eckford, 6 Wall. [73 U. S.] 484, 18 L. Ed. 920; Schaumberg v. United States, 103 U. S. 667, 26 L. Ed. 599). See, also, Nat'l Home, etc., v. Parrish, 229 U. S. 494, 33 S. Ct. 944, 57 L. Ed. 1296.

Interest.

The law of Washington, the forum, must control with relation to interest, and under the rule established by the Supreme Court of Washington, interest is allowable for money paid by mistake from the time of demand for specific amounts. Moylan v. Moylan, 49 Wash. 341, 95 P. 271. Interest is allowed on contracts when the amount can be determined by computation (Empire State Surety Co. v. Moran, 71 Wash. 171, 127 P. 1104), and it has also been so held by the same court in Parks v. Elmore, 59 Wash. 584, 110 P. 381, or where an article is sold for cash, allowable when the demand accrued, which would be on delivery or presentation of claim. Dickinson v. Crowe, 63 Wash. 550, 115 P. 1087. "The general rule is that interest will not be allowed upon unliquidated demands prior to the time when such demands are merged in the judgment." Wright v. City of Tacoma, 87 Wash. 334, 151 P. 837. In Dornberg v. Black Carbon Coal Co., 93 Wash. 682, 161 P. 845, the court allowed interest upon an open account for advance of loans from the time certainty of amount was ascertainable.

I think it may be stated that interest is

allowable when a claim is stated, or liquidated as to amount. A stated account is an agreed balance. An account which has been examined by both parties (1 Bouv. Law Dict. 109). Acceptance need not be in express terms (Volkenberg v. De Graaf, 81 N. Y. 268); it may be inferred from retention of the account an unreasonable time without objection (Freeland v. Heron, 7 Cranch [11 U. S.] 147, 3 L. Ed. 297). Acceptance must be expressed, or implied by conduct.

"Liquidated" means declared by the parties as to amount (Md. Steel Co. v. United States, 235 U. S. 451, at page 458, 35 S. Ct. 190, 59 L. Ed. 312), or fixed by operation of law. Interest will be allowed on claims due the plaintiff from the date of specific demand, all claims being for overpayment, from November 2, 1924, as found by the auditor and master, except on the rental charge.

While the fifth cause of action is for specific rental on contract, the court has held that only reasonable rental can be recovered, and primarily the issue was reasonable rental during the period of occupancy, and the sum was undetermined; it was not stated, or liquidated, or declared by the parties as to amount, nor could it be determined by computation, and required evidence to establish the amount and value of the occupancy, and interest on the rental account is allowable only from date of decree. See Rood v. Horton, 132 Wash. 82, 231 P. 450; also, Wright v. City of Tacoma, supra.

### Exceptions.

The court has not specifically passed on all of the exceptions to the report of the auditor and master. They are voluminous, and no good purpose could be subserved by extending this opinion by taking up specially each exception. It is plainly evident from what has been said as to the disposition of the exceptions, and the exceptions are denied in so far as out of harmony with the conclusions announced. The court also reserved rulings upon some of the offered testimony. Without specially pointing out these special questions and objections, the testimony has all been received and the court has given consideration to all of the evidence presented in so far as it has been deemed material, and given it such weight as it was deemed entitled. The court has also considered the offer of the income tax report, but does not give any weight of consequence to the omission to claim for loss on materials in these reports for the reason that the claim was disputed, and until the claim was liquidated, the defendant could not hope to have it recognized.

It could only have bearing upon the verity of the claim for unlifted material, and the evidence amply sustains, as found by the auditor and master and by this court, that the material was fit for use in the canceled ships, and not in excess for the purpose.

Under the agreed statement of facts the defendant is charged: Count 2, $57,743.97; count 3, $802,349.56; count 4, $623,387.46; count 5, reasonable rental, $1,082,685.12; count 6, $146,150.10; count 7, $3,750.00; count 8, $2,660.60; count 9, $9,288.43; count 13, $35,501.60; count 14, $26,124.42—making a total of $2,789,641.26.

It is admitted that the plaintiff paid to the defendant $4,612,500 under count 1. The auditor allowed and the court approved just compensation for unlifted material, $1,683,-771.90, and $33,600 daily bonus on contract No. 324, and the court allowed compensation for performance of contract No. 324, $177,-937.50, making a total of $1,895,309.40. Deducting this from $4,612,500 leaves $2,717,-190.60; making a total of $5,506,831.86.

The defendant under the agreed statement is entitled to a credit of $4,178,946.02, leaving a balance of $1,327,885.84 due to the plaintiff. A decree for that amount, with interest from the dates indicated, will accordingly be entered, on notice.